**INDIANAPOLIS CITY MARKET CORPORATION, Appellant–Defendant,**

v.

**MAV, INC., d/b/a/ Grecian Garden, Appellee–Plaintiff.**

**No. 49A02–0905–CV–399.**

Court of Appeals of Indiana.

Oct. 30, 2009.

---

Jonathan L. Mayes, Justin F. Roebel, Office of Corporation Counsel, Indianapolis, IN, Attorneys for Appellant.

Clifford T. Rubenstein, Maurer Rifkin & Hill, P.C., Carmel, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Indianapolis City Market Corporation (City Market) appeals the trial court's declaratory judgment and damage award entered in favor of appellee-plaintiff MAV, Inc., d/b/a Grecian Garden (MAV), regarding the renovation and construction of a restaurant in downtown

Indianapolis's City Market building. Specifically, the City Market argues that the trial court erroneously determined that it was bound by the provisions of a purported letter-agreement that was executed after the original lease agreement and that the trial court erred in refusing to enforce the indemnification and "hold harmless" clause in the lease that allegedly protected both parties from any damage claims. The City Market also contends that the trial court erroneously calculated the amount of damages that it allegedly owed MAV.

MAV cross-appeals, claiming that this appeal should be dismissed because the City Market failed to appeal the declaratory judgment within thirty days. As a result, MAV contends that the appeal is frivolous and it is entitled to appellate attorney fees.

We find that the City Market brought this appeal in a timely fashion and conclude that MAV is not entitled to an award of appellate attorney fees. We also conclude that the judgment and damage award for MAV were proper. Thus, we affirm the judgment of the trial court.

### FACTS[1]

The City Market is a not-for-profit organization that leases the City Market Building from the City of Indianapolis. Its purpose is to operate the historic City Market building in Indianapolis, which houses a variety of restaurants. MAV is an Indiana Subchapter S corporation that is incorporated for the sole purpose of operating a Greek restaurant stand in the City Market. Marina Mavrikis is MAV's sole shareholder.

On September 15, 2003, MAV entered into a lease agreement with the City Market to lease a 714–square–foot space in the historic Market House area of the building. In accordance with paragraph VI(D) of the lease, the City Market could relo-

cate MAV's leased space to a similar sized space upon the condition that the City Market pay MAV's "reasonable costs and expenses" to accommodate any relocation. Ex. U. at 6. The lease also states that "[a]ll additions, alterations, or changes" must be "approved in writing by the Landlord" and "shall become the property of the Landlord[.]" *Id.* Moreover, the lease agreement contains an indemnification paragraph and an integration clause. The integration clause provides that the lease is the "final and entire agreement between the parties and requir[es] amendments or modifications to be a writing signed by both parties." *Id.* at 15.

Sometime before October 13, 2006, the City Market informed MAV that the historic Market House portion of the building would undergo renovation. As a result, the City Market tenants participated in a drawing to choose temporary spaces in the building. Thereafter, the City Market's executive director informed MAV of various relocation options during the renovation.

On November 1, 2006, the City Market sent MAV a letter, providing it with notice that on December 31, 2006, the City Market intended to relocate MAV either to a like-sized location in the Market House or into the east wing of the City Market. The letter reiterated the City Market's offer to permit MAV to occupy a previously-selected temporary space at one-half of the cost with reduced common expenses based on square footage, plus free water and electricity. The letter further stated that "[r]enovation is scheduled to begin January 2, 2007, and be completed on or about March 31, 2007." Ex. G. The letter certified that the reduced rates would not apply to a relocation space in the City Market, and it was estimated that MAV's

---

**1.** We heard oral argument in this case in Indianapolis on September 30, 2009. We

commend counsel for their able presentations.

rent would be approximately $1500 per month if they remained in the Market House area and $392 in the temporary location. Sometime after the November correspondence, MAV agreed to move into the temporary location with the cost reductions that were outlined in previous letters.

The renovations began with the relocation of tenants during the weekend of December 29, 2006. MAV relocated into the east wing of the City Market in January 2007 because it could not remain in the Market House area because of health code issues. While operating in the east wing, the MAV's daily gross income was significantly less than the daily gross income in the Market House after renovation.

Although the tenants were initially told that the renovations would be completed by March 31, 2007, that date was extended several times in light of cost overruns, unexpected construction costs, and insufficient funds. The first tenants moved into the renovated Market House in July 2007; however, they were new tenants and did not include those who had been relocated into the east wing.

Sometime later that month, the City Market discussed plans with MAV to build out the space in the renovated Market House. The City Market's executive director, Joe Dayan, wrote a letter-agreement to MAV on August 24, 2007, confirming its obligation to fund or build the Grecian Garden space in the Market House area, with the work to be performed by the City Market's own contractor. However, the letter-agreement also provided that "[s]hould they so choose, Grecian Garden may seek an alternate contractor to complete their own build-out." Ex. 2. Moreover, it stated a method of payment that the City Market would follow if MAV decided to use its own contractor. Dayan initialed the document, which he considered to be an agreement with MAV's contractor "to facilitate the building of the space as quickly as possible." Tr. p. 264, 267–68.

Two exhibits were attached to the letter-agreement, indicating how the total $23,630 build out allowance would be paid. The original exhibit did not set forth the complete schedule of payments because a representative of the City Market had handwritten the schedule and wanted to "type it up to make it look neater and then she would attach it to [the letter-agreement]." *Id.* at 18–20. One of the exhibits that both parties had signed indicated the City Market's agreement to make an initial $5000 payment to the contractor, but no reference was made as to a particular contractor. A follow-up exhibit set forth the full schedule of payments that the parties had agreed upon.

At some point, MAV represented to the City Market that it had retained the Excel Construction Company (Excel) for the project. In response, on August 24, 2007, the City Market issued a check to Excel for materials in the amount of $5000. Subsequently, MAV and Excel could not agree to terms regarding the project. As a result, MAV decided to find another contractor. Excel issued MAV a refund of the $5000 that was paid, and MAV forwarded those funds to its attorney to hold in trust until a new contractor was selected.

On September 17, 2007, Dayan asked MAV when construction would commence. After Mavrikis stated that the restaurant "was still getting bids" from contractors, Dayan told Mavrikis that construction should commence or the City Market's money should be returned. Tr. p. 144. In light of the circumstances, Dayan believed that he had been deceived by MAV's intentions.

After learning that MAV intended to hire another contractor, the City Market demanded the return of the $5000 or, alternatively, that it be paid immediately to a new contractor. In response, MAV contended that its decision to select a new contractor and have the money held in trust by MAV's legal counsel did not violate the letter-agreement. As a result, MAV refused to return the $5000 to the City Market and promised to disburse the funds when the new contractor was selected.

MAV requested—and the City Market approved—William Bryant/Maintenance One LLC (William Bryant) as the new contractor on October 3, 2007. However, the City Market decreed that it would not pay the new contractor until it provided the City Market with invoices to substantiate the work. MAV argued that it was not required to submit any invoices because such a provision was not part of the letter-agreement amendment.

After MAV refused two additional demands to return the $5000, the City Market terminated the letter-agreement on October 24, 2007. As a result, it refused to continue funding MAV's build out. The City Market advised MAV that it had terminated the build-out agreement and that MAV would be responsible for the entire cost of any build-out if MAV wanted to return to the original premises.

On December 21, 2007, MAV filed a verified complaint for a declaratory judgment, requesting that the trial court:

A. Interpret and construe the lease, including modifications, and determine that Defendant should pay Plaintiff's approved alternate contractor to build-out the leased premises;

B. Interpret and construe the lease, including modifications, and declare that the Defendant cannot termi-

nate the lease by reason of Plaintiff's failure to complete the build-out of its original space;

C. Pending the final determination of this Complaint, enjoin and restrain the Defendant attempting to terminate the lease because of Plaintiff's failure to complete the build-out of its original space.

Appellant's App. p. 19.

MAV also sought damages for loss of business, lost profits, and damages for the City Market's wrongful threat to file criminal conversion charges against it. MAV claimed that the City Market threatened to file criminal charges against it for the sole purpose of "retaliation, hindrance, delaying and damaging Plaintiff's business and/or reputation." *Id.* at 21.

On February 13, 2008, the trial court heard evidence on the contract issue as to whether the letter-agreement of August 24, 2007, constituted an amendment to the lease. On February 19, 2008, the trial court entered a declaratory judgment for MAV, finding that the August 24, 2007, letter-agreement had amended the lease and that the City Market had breached its contractual obligation to MAV. The trial court's findings of fact and conclusions of law provided as follows:

5. On August 24, 2007, Plaintiff had already selected an alternate contractor and a total payment plan of $23,630.00 was set out with specific time deadlines for payments.

6. On August 24, 2007, Defendant paid an initial payment of $5000 to the alternate contractor.

7. By October, 2007, Plaintiff had dismissed the alternate contractor, the $5000 payment was refunded to Plaintiff, and a subsequent alternate contractor was retained.

8. Defendant has since refused build-out of Plaintiff's Market House space until and unless Plaintiff refunds the $5000 payment, or makes an accounting of the monies for the purpose of the build-out.

### Conclusions of Law

1. The Lease Agreement is not ambiguous.

2. The parties intend that Defendant pay all reasonable expenses to "relocate" Plaintiff in the Market House of the City Market, and that Plaintiff shall "execute ... amendments" which are necessary to "reflect the foregoing changes and/or alterations."

3. The unilateral demand for Plaintiff to move out of the Market House for the renovation is "relocation" within VI.D of the Lease Agreement.

4. The August 24, 2007 letter agreement is an amendment necessary for the renovation and obligatory build-out by Defendant.

5. The August 24, 2007 letter agreement is not ambiguous.

6. The parties intend, and the agreement requires, that Defendant shall allow Plaintiff's alternate contractor to perform a build-out of Plaintiff's Grecian Garden space in the Market House at a price of $23,630.00.

7. The parties further intend, and the agreement requires, that Defendant shall pay an initial payment of $5000 to the alternate contractor, which is already performed.

8. The parties intend, and the agreement requires, that Defendant is obligated to make the balance of the payments to the alternated [sic] contractor as agreed on August 24, 2007, that is, for the same amounts and under comparable time periods, and "Once completion of the work is satisfactory to [the parties], the City Market Corporation will release the final amount due and/or remaining funds to the alternate contractor."

9. There are no provisions of the Lease Agreement, or the August 24, 2007 amendment, which require any accounting of funds paid to an alternate contractor.

10. All other provisions of the Lease Agreement and August 24, 2007 amendment remain in full force and effect, including compliance with City Market guidelines for work and build-out.

Appellant's App. p. 55.

On February 26, 2008, the parties entered into a "Build Out and Relocation Agreement," by which the City Market agreed to pay for the build out in accordance with the terms of the letter-agreement. MAV's space was built out, and on April 7, 2008, MAV opened for business in the renovated Market House.

On February 19, 2009, a bench trial was held regarding MAV's claim for damages.[2] The trial court determined that the length of the breach was 104 days, from November 2007 until April 7, 2008.

MAV presented a report that was prepared by a Certified Public Accountant (CPA) showing MAV's income and expenses from January 2, 2007, to November 17, 2008. The CPA prepared the report after reviewing a box containing MAV's

---

**2.** The parties agreed to dismiss Count III regarding MAV's claim for damages that stemmed from the criminal charges that the City Market had threatened to file against it.

cash register tapes for income and receipts from various paid invoices for expenses.

The report established that from January 2, 2007, to April 3, 2008, MAV's daily net income was $92.48. From April 7, 2008, to November 17, 2008, which represented the time after MAV moved back into the renovated Market House, MAV's daily net income was $575.08. Thus, in accordance with the report, the difference between MAV's daily net income while in the east wing and after its move back into the renovated Market House amounted to $482.60 per day.

The testimony at trial established that MAV's bookkeeping was not exact, that a portion of gross income may have been overstated, and that some of the expenses may have been understated. Thus, the trial court took into account the lack of exact numbers and reduced the daily net income in the CPA's report by nearly 16%.[3]

The trial court ultimately determined that MAV sustained damages in the amount of $42,382.08 [4] in damages as a result of the City Market's breach of the lease and letter agreement. On March 23, 2009, the trial court entered the following findings of fact and conclusions of law:

### FINDINGS OF FACT

. . .

6. The build out of the Grecian Garden space in the renovated Market House was completed during the time period of (a) October 5–12, 2007, and (b) February 26–April 7, 2008 (except for the 10 day period in which the City Market delayed the build out due to not delivering the

facade material as agreed in the Build Out Agreement).

7. From November 2007—April 7, 2008 the Grecian Garden was the only tenant open and operating in the East Wing.

8. Between January 1, 2007—April 3, 2008 (the time period when the Grecian Garden was open and operating in the East Wing) Grecian Garden averaged total daily net income of $92.48.

9. Between April 7, 2008—November 17, 2008 (the time period when the Grecian Garden was open and operating in the renovated Market House, and comparable to its past location in the Market House) Grecian Garden averaged approximate total daily net income of $500.00.

11. Evidence is conflicting or insufficient regarding the Grecian Garden's intent and the City Market's obligations before September/October, 2007, and the onset of this litigation.

### CONCLUSIONS OF LAW

. . .

3. As a direct result of the City Market's prior breach, Grecian Garden could not build out its space which would reasonably have been completed in November, 2007 and Grecian Garden would have been open and operating. [Grecian] Garden lost profits from that date forward to the date it actually opened for business in the renovated Market House on April 7, 2008, a period of . . . 104 days calculated as 5 business days per week excluding holidays.

4. The term "lost profits" in contract actions may mean either the profit that

---

**3.** The trial court reduced MAV's daily income amount from $482.60 per day to $407.52 per day. Appellant's App. p. 91, 94.

**4.** The trial court found that MAV had sustained damages in the amount of $407.52 per day multiplied by 104 days. Appellant's App. p. 94.

the non-defaulting promise expected to receive from the breached contract, or the profit that he expected to make from collateral transactions using the promised performance as one of the bases of those collateral transactions. . . .

5. The difference between the daily net income while the Grecian Garden was operating in the East Wing, and the approximate daily net income while the Grecian Garden was operating in the renovated Market House after April 7, 2008 was $407.52.

6. The lost profits sustained by Grecian Garden from November, 2007 -April 7, 2008 as a result of the City Market's breach is 104 days multiplied by $407.52 which equals $42,382.08.

7. The Grecian Garden's lost profits were proven with a reasonable degree of certainty, the City Market's wrongful acts caused the loss of profits, and the lost profits were reasonably within the contemplation of the City Market.

8. The testimony on lost profits was sufficient to make a fair and reasonable finding as to the amount of proper damages.

Appellant's App. p. 90–94. The City Market now appeals and MAV cross-appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

When the trial court enters findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we will not set aside the findings or judgment unless clearly erroneous. We must first determine whether the evidence supports the findings of fact and then whether the findings support the judgment. S–Mart, Inc. v. Sweetwater Coffee Co., 744 N.E.2d 580, 585 (Ind.Ct.App.2001). Findings are clearly erroneous if the record contains no facts or inferences supporting them, whereas a

judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. Garling v. Ind. Dep't of Nat. Res., 756 N.E.2d 1029, 1032 (Ind.Ct.App.2001). We consider only the evidence most favorable to the prevailing party and we do not reweigh the evidence or judge the credibility of witnesses. Id.

### II. MAV's Cross–Appeal

■ Before proceeding to the merits of the City Market's claims, we first address the arguments that MAV presents on cross-appeal regarding the timeliness of the City Market's appeal of the declaratory judgment. MAV argues that the City Market failed to appeal the judgment in a timely fashion. Thus, MAV contends that the appeal was frivolous and it is entitled to appellate attorney's fees.

In support of its contention, MAV points out that, pursuant to Indiana Appellate Rule 2(H), "[a] judgment is a final judgment if . . . (5) it is otherwise deemed final by law." Also, in accordance with the Uniform Declaratory Judgment Act, which is codified in Indiana Code section 34–14–1–1 et seq., a declaratory judgment "has the force and effect of a final judgment or decree." I.C. § 34–14–1–1.

MAV asserts that the City Market's notice of appeal was due by March 20, 2008, which was thirty days after the declaratory judgment was entered. Thus, because the City Market did not file its appeal until March 23, 2009, MAV asserts that the appeal must be dismissed. Moreover, MAV contends that it is entitled to appellate attorney's fees because the City Market's appeal is "utterly devoid of all plausibility" in light of the untimely filing. Appellee's Br. p. 19.

Pursuant to Appellate Rule 66(E), we may "assess damages if an appeal . . . is frivolous or in bad faith. Damages shall be in the Court's discretion and may in-

clude attorneys' fees." Because of the alleged untimeliness of the City Market's appeal, MAV argues that it is entitled to an award of appellate attorney fees because "responding to [the declaratory judgment portion] of the ... appeal is a waste of MAV's and this court's time and should be subject to sanctions." Appellee's Br. p. 20.

Notwithstanding MAV's contentions, not all declaratory judgments are issued pursuant to the Uniform Declaratory Judgment Act. For instance, in *Artusi v. Mishawaka*, 519 N.E.2d 1246, 1250 (Ind.Ct.App. 1988), this court explained that Trial Rule 57 has greatly expanded our trial courts' authority to issue declaratory judgments:

> Prior to the adoption of Trial Rule 57 in 1969, Indiana courts could only "declare rights, status, and other legal relations" in declaratory judgment actions under our Declaratory Judgments Act, IND. CODE 34–4–10–1, et seq. Executory or coercive relief could not be granted because the text of the act was broader than its title. *Brindley v. Meara* (1935), 209 Ind. 144, 198 N.E. 301, 304, 101 A.L.R. 682. However, Trial Rule 57 now provides in such actions "[a]ffirmative relief shall be allowed ... when the right thereto is established." Thus, the question is whether retirees were required to pursue both a declaration of their rights and pre-judgment interest in the declaratory judgment action. We think not.

Our review of the record reveals that MAV never asserted that it was bringing an action under the Uniform Declaratory Judgment Act. Moreover, under Count I of MAV's complaint, the request for declaratory judgment requests relief that is permissible under Trial Rule 57, but not allowable under the Uniform Declaratory Judgment Act. More particularly, the City Market points out that MAV requested the trial court to "enjoin and restrain the Defendant [from] attempting to terminate the lease because of Plaintiff's failure to complete the build-out of its original space." Appellant's App. p. 19. As a result, it is apparent that MAV sought "coercive relief" pursuant to Trial Rule 57, and nothing in the February 2008 order invokes the court's authority under the Uniform Declaratory Judgment Act. Moreover, the February 2008 order interpreted the parties' agreement and states their obligations under the agreement. Appellant's App. p. 51–55.

In light of these circumstances, we conclude that the City Market's appeal is properly before us. Therefore, MAV does not prevail on its cross-appeal and it is not entitled to an award of appellate attorney fees.

### III. The City Market's Claims

#### A. Proper Repudiation

 Proceeding to the issues that the City Market presents on direct appeal, it first claims that the judgment must be set aside because the trial court committed "clear error" when it determined that the City Market was bound by the August 24, 2007, letter-agreement. The City Market claims that "it had the right to void and repudiate the letter-agreement and did exercise that right." Appellant's Br. p. 14. As a result, the City Market contends that it "ended any obligation when it repudiated the letter agreement on October 24, 2007." *Id.* at 12.

 We initially observe that the interpretation and construction of contract provisions is a function for the courts. *Centennial Mortgage, Inc. v. Blumenfeld*, 745 N.E.2d 268, 273 (Ind.Ct.App.2001). The primary goal of contract interpretation is to give effect to the parties' intent. *Beiger Heritage Corp. v. Montandon*, 691 N.E.2d 1334, 1336 (Ind.Ct.App.1998). The

court should attempt to determine the intent of the parties at the time the contract was made by examining the language used to express their rights and duties. *Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 478 (Ind.Ct.App.2000). Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning. *Centennial Mortgage*, 745 N.E.2d at 273–74.

The City Market asserts that the August 24, 2007, letter was tendered at a time when MAV was misrepresenting that it had already selected Excel as its contractor. Tr. p. 228. More particularly, the City Market believed that it "paid the money to the contractor [on August 24, 2007,] so the contractor could buy materials and start construction [the following] Monday." *Id.* at 265. The City Market points out that MAV never reached any agreement with Excel to perform the construction. And Dayan, the City Market's Executive Director, stated that he was "deceived by [MAV's] intentions at the time of the letter-agreement." Ex. A. In light of MAV's alleged misrepresentations about the construction build out, the City Market claims that it properly repudiated the letter-agreement on October 24, 2007, when Dayan delivered a letter to MAV stating that the City Market considered "any understanding between the City Market and Grecian Garden and its owners for build-out of space in the Historic Market House to be terminated." Ex. D.

Notwithstanding these contentions, the evidence established that MAV and the City Market voluntarily entered into the letter-agreement, and that document expresses the intent of both parties. MAV wanted to use its own contractors, and the City Market agreed to that arrangement. Tr. p. 15, 46, 49. The City Market drafted the letter agreement, so any terms that it believed were material to the parties'

agreement could and should have been included in the contract. More specifically, if the selection of a certain contractor and a signed contract were vital conditions of the letter-agreement, the terms of that document should have reflected the same.

In our view, the City Market is hard-pressed to claim that it had the right to repudiate the agreement on the basis of MAV's alleged misrepresentations because it knew that the agreement that MAV had with Excel had fallen through. Notwithstanding such knowledge, the City Market specifically approved William Bryant as MAV's new contractor before the repudiation letter was issued. Ex. B, D.

In sum, the four corners of the letter-agreement supported the trial court's entry of the declaratory judgment in its favor, and the City Market does not prevail on its claim that it properly repudiated the agreement.

### B. Indemnification Clause

■ The City Market next claims that the judgment for MAV must be set aside because the indemnification and hold harmless clause in the lease precludes it from liability and having to pay damages in the event of its own breach. More specifically, the City Market maintains that the indemnification provision in the lease "protects [it] from damages incurred by its tenants in a variety of circumstances that include this case." Appellant's Br. p. 16.

■ In general, an indemnity clause "covers the risk of harm sustained by *third persons* that might be caused by either the indemnitor or the indemnitee. It shifts the financial burden for the ultimate payment of damages from the indemnitee to the indemnitor." *Morris v. McDonald's Corp.*, 650 N.E.2d 1219, 1222 (Ind.Ct.App. 1995) (emphasis added). Indemnification clauses are not void as against public poli-

cy, though they will be strictly construed, and the intent to indemnify the indemnitee for its own negligence must be stated in clear and unequivocal terms. *Sequa Coatings Corp. v. N. Ind. Commuter Transp. Dist.*, 796 N.E.2d 1216, 1222 (Ind.Ct.App. 2003).

The indemnification clause set forth in the lease between MAV and the City Market provides that

> Tenant shall indemnify and save harmless Landlord, and Landlord shall indemnify and save harmless Tenant, from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, and causes of action of any and every kind and nature arising or growing out of or in any way connected with Tenant's use, occupancy, management, or control of the Premises or Tenants' operations, conduct or activities in the building.

Ex. U.

The City Market makes the bold assertion that the above language necessarily protects it from MAV's damages that resulted from its own breach of the lease. This specious argument avails the City Market of nothing. Nowhere does the lease state that MAV intended to indemnify the City Market from its own negligence or breach. There is no third party involved in this case who had been damaged, and it is apparent that the indemnity clause in the lease between MAV and the City Market was designed to cover the risk of harm sustained by third persons caused by the indemnitor that relates to the negligence of either party.[5] *Morris*,

650 N.E.2d at 1222. As a result, the City Market's claim fails.

### C. Damages

The City Market next claims that the trial court's award of damages to MAV cannot stand. Specifically, the City Market argues that the trial court did not limit its calculation of damages to those that were foreseeable, and the damage award was not within the scope of the evidence that was presented at trial.

 Generally, a party injured by a breach of contract may receive consequential damages. *Johnson v. Scandia Assocs.*, 717 N.E.2d 24, 31 (Ind.1999). Consequential damages may be awarded on a breach of contract claim when the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made. *Id.* This follows the rule announced in *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854), and generally limits consequential damages to reasonably foreseeable economic losses. *Johnson*, 717 N.E.2d at 31. Consequential damages may include lost profits, providing the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness. *Clark's Pork Farms v. Sand Livestock Sys., Inc.*, 563 N.E.2d 1292, 1298 (Ind.Ct.App.1990).

 A factfinder may not award damages on the mere basis of conjecture and speculation. *Farm Bureau Mut. Ins. Co. v. Dercach*, 450 N.E.2d 537, 540 (Ind. Ct.App.1983). However, as long as the amount of loss can be ascertained with the relative degree of certainty and based

---

5. Indeed, if we adopted the City Market's interpretation of this clause, any and all indemnitees to any contract could breach their contract with impunity, knowing that the indemnitee would never be liable for any damages for a breach. Such an interpretation could conceivably preclude the City Market from recovering damages following a tenant's nonpayment of rent or for damages resulting from a tenant's negligent destruction of the premises.

upon proper evidence, loss of profits is admissible as a measure of damages. *Berkel & Co. Contractors, Inc. v. Palm & Assocs.*, 814 N.E.2d 649, 658 (Ind.Ct.App. 2004).

We also note that lost profits need not be proved with mathematical certainty. *Farm Bureau Mut. Ins. Co.*, 450 N.E.2d at 541. Lost profits are not uncertain where there is testimony that, while not sufficient to put the amount beyond doubt, is sufficient to enable the factfinder to make a fair and reasonable finding as to the proper damages. *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind.App. 632, 652, 291 N.E.2d 92, 106 (1972). Finally, a proper award of lost profits must be confined to the loss of net profits. *Berkel*, 814 N.E.2d at 659.

In this case, the evidence showed that MAV was delayed in opening its restaurant in the renovated Market House from November 2007 through April 3, 2008. Appellant's App. p. 72, 92. During that time, MAV had total daily gross income of $187.69 and total daily net income of $92.48. *Id.* at 72, 91, Ex. 12. When MAV moved back into the renovated Market House, its total daily gross income increased to $745.45 and total daily net income increased to $575.08. Appellant's App. p. 72, Ex. 12 at 24.

Although Mavrikis admitted that she was "not the best" record keeper, tr. p. 114, she provided the accountant with MAV's financial records from January 1, 2007, to November 17, 2008. Tr. p. 114, 122, 211, 295–96. The CPA testified that she examined receipts, income from cash register tapes, and business expenses. *Id.* at 176. She testified that if MAV gave her all of its financial records of income and expenses, her report was accurate. *Id.* at 200. The trial court acknowledged in its judgment that MAV's calculation of lost profits from the report were not exact,

reducing the amount of lost net profits by 16% from what MAV had requested. Appellant's App. p. 77, 94. More particularly, as set forth above, the trial court reduced MAV's daily income amount from $482.60 to $407.52 per day, which represented the difference in daily net income from the time that MAV was in the east wing until it began operating again in the renovated Market House. Appellant's App. p. 91, 94.

Although the City Market contends that the damage award was speculative and should not have been based on foreseeable profits, former City Market executive directors and employees testified about the purposes and anticipated results of the renovation of the market hours. Tr. p. 257–59, 270–71, 293. That testimony supports the trial court's conclusion that increased business and higher profit—for all the tenants at the City Market—were reasonably within the contemplation of the City Market when the letter agreement was signed.

Finally, we note that the City Market maintains that some of MAV's increased sales could have been attributed to decreased competition from other tenants who left the market. It also points out that the trial court's calculation of damages calculation did not include a deduction for labor costs, including the costs of the hourly employees who were paid in cash, the housing and vehicle compensation that the manager/owner's son received, or compensation for the work that MAV's owner performed. *Id.* at 120, 122–23, 192–93, 199, 212, 218. However, the trial court heard all of the evidence, and the City Market's arguments amount to request for us to reweigh the evidence, which we will not do. It is apparent that the trial court weighed all of the evidence, judged the credibility of the witnesses, and exercised its discretion in calculating the amount of MAV's lost profits.

In our view, the trial court was able to ascertain, with a relative degree of certainty, the measure of damages from the lost opportunity, i.e., MAV's inability to operate in the renovated Market House from November 2007 until April 7, 2008. The amount of damages calculated by the trial court was within the scope of the evidence that was presented at trial, and we decline to disturb that award.[6]

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and RILEY, J., concur.

6. As an aside, we reject the City Market's related argument that MAV failed to mitigate its damages when it did not agree to the City Market's demands to refund the $5000 or only pay after receiving invoices. As discussed above, the evidence established that the City Market: (1) had the duty to perform its obligation under the letter agreement; (2) had equal knowledge that the failure to provide the money to MAV to build out the space would result in a delay of moving into the renovated Market House and therefore lost profits; and (3) could have fulfilled its obligations by disbursing the remaining money to MAV. In light of these circumstances, we cannot say that MAV was required to mitigate its damages by refunding the money and/or providing invoices to the City Market.