**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 19 2013, 7:06 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**JEFFERY M. LEEPER**
**ERIK L. AUFDERHEIDE**
Aufderheide & Leeper, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY A. NEIBARGER**
**E. ASHLEY PAYNTER**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KING OF CLEAN AUTOMOTIVE, LLC, | ) | |
| | ) | |
| Appellant-Defendant-Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  29A02-1205-MI-414 |
| | ) | |
| NEW TRUCK ALTERNATIVE, LLC, | ) | |
| | ) | |
| Appellee-Plaintiff-Counter-Defendant. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT 3
The Honorable William J. Hughes, Judge
Cause No. 29D03-1111-MI-11919

June 19, 2013

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

This case involves the soured relations between the owners of two small businesses, Gary McLemore of New Truck Alternative, LLC (NTA) and Bill Brown and Kyle Owen of King of Clean Automotive, LLC (KOC). Initially, based on McLemore's projections that he would be bringing a lot of vehicles to KOC, McLemore struck a deal with KOC's owners to have those vehicles detailed for a discounted price. Later, McLemore also brought two vehicles—a boat and a minibus—to KOC for special services not contemplated by the aforementioned agreement. More particularly, McLemore had KOC winterize and shrink wrap a boat, and he had KOC pick up the minibus to provide an estimate for lettering and decaling for a prospective purchaser.

Unfortunately, things became heated in July 2011 when McLemore discovered mold in the boat and returned it to KOC for remediation. Owen told McLemore that he would "take care of it"; however, when McLemore returned for the boat, he was told that he would have to pay approximately $1500 to $1800 before he could pick up either vehicle. Tr. p. 194. And later, McLemore discovered that KOC was charging him for additional work on both vehicles that he had not authorized.

KOC threatened to file mechanic's liens on the vehicles, but they did not actually do so until November 2011. In response, NTA filed the instant lawsuit for replevin of the vehicles. After a bench trial, the trial court concluded that KOC's mechanic's liens were not valid and granted NTA's petition for replevin. Additionally, the trial court awarded NTA $5800 in damages for lost profits on the minibus.

2

KOC appeals, essentially arguing that the trial court arrived at the wrong conclusions on their mechanic's liens and on NTA's petition for replevin based on the evidence presented at the bench trial and that the damage award was erroneous. However, because the trial court's extremely thorough findings of fact and conclusions of law were supported by adequate evidence in the record, we affirm the judgment of the trial court.

### FACTS

McLemore is the sole owner and sole employee of NTA,[1] which is in the business of selling previously owned vehicles, motorcycles, and boats. He also manages a fleet of thirty-four vehicles for another company, and in this role he arranges for the maintenance, repairs, and storage of the vehicles.

McLemore's first business dealing with KOC occurred in June 2010 when he brought one of NTA's vehicles in to be detailed at a price of $135. Then, in November 2010, McLemore took two boats to KOC to have them winterized and shrink wrapped so that he could store them outside for the winter. For each of these transactions, KOC presented McLemore with a verbal or written estimate for the cost of the services, and McLemore provided verbal authorization. KOC also provided McLemore with written invoices when McLemore arrived to pay for the services and claim the vehicles.

Once the boats were ready, McLemore inspected them at KOC's lot and, finding no apparent issues, transported them to the places where he had arranged to store them

---

[1] Because of this, McLemore's actions as related throughout this opinion can be attributed directly to NTA, and we use both names somewhat interchangeably.

for the winter. One of the boats, a 2005 Kayot S225V deck boat, was stored at the home of Doug Solmos, a friend of McLemore. McLemore visited Solmos's home multiple times each week and observed the boat, but he never noticed any problems with the shrink wrap.

In February 2011, McLemore brought another vehicle to KOC for detailing. At that time, McLemore spoke with Owen and negotiated a verbal agreement in which he would be charged $115 per vehicle from that point forward for a full detailing. This rate applied both to vehicles owned by NTA and to the fleet vehicles that McLemore managed. Additionally, McLemore arranged for a standard storage fee of $2 per day for fleet vehicles with no storage costs to be assessed for vehicles owned by NTA.

From February 2011 until May 2011, McLemore took an additional sixteen vehicles to KOC for detailing. KOC charged the discounted rate of $115 for detailing nine of those vehicles, but it charged $45 for a 2011 Yamaha Rhino 700 ATV, $125 for five vehicles, and $135 for one vehicle. KOC charged storage fees for six vehicles, none of which were owned by NTA. No storage fees were charged for vehicles owned by NTA despite the fact that McLemore sometimes left these vehicles at KOC for up to three weeks.

In April 2011, McLemore purchased a 1996 Ford minibus for $5175 at an auction "solely for the purpose of selling it to Zion Lutheran High School at a profit." Tr. p. 53. Specifically, McLemore had arranged to sell the minibus to the high school for $11,000. Because the minibus would need to have the school's name and logo placed on it and

4

McLemore knew that KOC provided lettering and decaling services, McLemore contacted Brown and arranged for KOC to transport the bus from the auction and to keep it on their lot until Zion Lutheran provided McLemore with their logo and lettering preferences, at which time KOC would provide an estimate for those services. McLemore and Brown did not discuss any charges for the valet service or the storage of the minibus until Zion Lutheran provided its preferences.

Once the minibus was at KOC, McLemore contacted David Borkowski, another small business owner with whom he had a working relationship. McLemore asked Borkowski to provide him with an estimate to repair a gap on the rear door of the minibus that had been allowing water inside the vehicle. Borkowski went to KOC, inspected the minibus with Brown, and determined that the issue could be fixed simply by caulking along the door frame. Borkowski advised McLemore that the repair should cost no more than $50. Borkowski then decided that he "didn't really need this bus down at [his] facility, it's already here having other work done at [KOC], King of Clean can do it." Tr. p. 147. Brown agreed to perform the repair and, sometime near the end of May, KOC also detailed the bus because it was "obvious it needed detailed." Id. at 163. However, KOC did not notify McLemore that either service had been completed.

On July 2, 2011, McLemore took prospective purchasers from Ohio to view the 2005 Kayot deck boat at his friend's home. McLemore removed the shrink wrap from the boat in the presence of the couple, and they discovered that the inside of the boat had "an extreme amount of mold and mildew" in it. Tr. p. 39. McLemore took the boat to

5

KOC the same day and spoke with Owen, and they discussed what could have happened to cause the mold. One possible theory was that a vent cap in the shrink wrap had fallen off, and McLemore allegedly told Owen, "now that you mention it there was a vent cap missing." Id. at 167.

Even though it was not KOC's responsibility to check the boat when it was stored offsite, Owen told McLemore, "So obviously we want to rectify the situation, Gary, and keep you happy." Id. at 169. When "the solution was I want my boat water ready," Owen told McLemore "don't worry, we'll take care of it or something along those lines." Id. at 169, 194. Owen did not mention any price for the mold remediation or the cost to make the boat ready for the water, a service that KOC calls "summerization." Id. at 170.

After being notified that the mold remediation was complete, McLemore went to KOC to pick up the boat on July 12, 2011. At that time, McLemore was verbally advised that he could not pick up the boat until he paid his bill in full. Specifically, McLemore was told he would have to pay $1500 to $1800, which apparently included the boat's mold remediation and summerization as well as a full detail of the minibus, $31 for picking up the minibus and $50 for caulking its door, and storage fees for both vehicles. No written invoice was provided. McLemore refused to pay and demanded release of the boat and minibus, but KOC refused.

Over the next few months, McLemore continued to demand the return of the boat and minibus, and KOC mailed McLemore notices of its intention to file mechanic's liens on the vehicles. Although these notices were dated July 12, 2011, McLemore did not

6

receive them until August 27, 2011. In October 2011, KOC again winterized and shrink wrapped the boat to protect it from the coming winter and added fees for those services to NTA's bills.

On November 22, 2011, NTA filed the instant lawsuit against KOC. As later amended, NTA's complaint sought replevin of the boat and minibus, alleged negligence on the part of KOC, and requested damages under both the replevin and negligence counts. KOC filed its mechanic's liens on November 30, 2011.

A bench trial commenced on February 28, 2012, and concluded on March 23, 2012. McLemore, Owen, and Brown each testified, but their accounts of the relevant facts often varied considerably. For example, the three disagreed about whether the minibus would have been covered by the $115 detailing agreement. McLemore stated that he would not have expected detailing of a minibus at $115 and that he never authorized detailing of the bus. Owen testified that he believed the minibus was contemplated by the $115 detailing agreement and that if that had been all that McLemore had wanted done to the minibus, a simple detailing could have been done for that price. Brown disagreed with his partner, stating that "its size did not qualify it for a $115 detail" and that "[a]nybody that nominally would think that $115 was a fair price would just be out of their mind." Tr. p. 225. Ultimately, the mechanic's lien for the minibus showed an itemized charge for the bus detailing at a price of $560.

On April 23, 2012, the trial court issued an order with specific findings of fact and conclusions of law pursuant to KOC's Trial Rule 52 request. These findings of fact and

7

conclusions of law were extremely thorough and reflected the trial court's determinations of credibility on several issues that were key to the litigation. In particular, the trial court found that McLemore "is a very shrewd business man who is able to push the meaning and extent of any agreement to the limits of its reasonable enforceability." Appellant's Br. p. 13. The trial court also found that KOC "was somewhat frustrated with [NTA]" because it "believed [NTA] would be bringing in more cars . . . for detailing and the price being charged was based upon a volume that was not realized." Id. at 14.

Regarding the boat, the trial court found that KOC was not liable for negligence resulting in the mold because it had adequately performed the shrink wrapping and had provided McLemore with care instructions before he left the premises. The trial court concluded that the mold was caused by a vent cap that went missing sometime over the winter that McLemore failed to notice during his inspections of the boat. However, the trial court also determined that when McLemore brought the mold to KOC's attention, Owen represented to McLemore that KOC would "take care of it" and "make the boat water ready." Id. at 16. Based upon this representation, the trial court concluded that McLemore "had a reasonable expectation . . . that there would not be any charge for any service performed to the boat" in July 2011. Id. Thus, the trial court denied NTA's action for negligence and KOC's mechanic's lien and granted NTA's motion for replevin as to the boat. However, the trial court did not award NTA any damages for lost profits regarding the boat because it concluded that the prospective purchasers "were discouraged by the mold and not the delay . . . ." Id. at 18.

8

As for the minibus, the trial court found that McLemore only authorized KOC to provide a free estimate for lettering and decaling and that he never authorized KOC to perform either the detailing or the $50 door repair. Additionally, the trial court found that although the minibus did not fall within the $115 detailing agreement, McLemore never consented to any storage fees for the minibus, and its storage was contemplated by the agreement that KOC would not charge storage fees for vehicles owned by NTA. Moreover, the trial court concluded that although the work on the minibus was allegedly performed in April or May 2011, KOC did not notify NTA that any services had been completed on the minibus until July 12, 2011, and it failed to file a mechanic's lien for those services until November 30, 2011. The trial court then denied KOC's mechanic's lien as to the minibus, granted NTA's motion for replevin of the same, and awarded NTA $5800 in lost profits because it had not been able to complete the sale to Zion Lutheran High School when the minibus was being wrongfully possessed by KOC.

KOC now appeals.

### DISCUSSION AND DECISION[2]

On appeal, KOC argues that the trial court erred by denying KOC's mechanic's liens and awarding damages to NTA for the minibus. Essentially, KOC's argument on the first issue is that the trial court arrived at the wrong findings and conclusions based on the evidence presented. In other words, KOC asks us to reweigh the evidence and to give more weight to the evidence favorable to its position.

---

[2] Subsequent to the filing of the briefs in this case, counsel for New Truck Alternative, LLC submitted a motion for leave to withdraw their appearances. This motion is hereby granted.

9

When a trial court has issued specific findings of fact and conclusions of law, we review the judgment using a two-tiered standard of review and will not set aside the findings or conclusions unless they are clearly erroneous. Indianapolis City Market Corp. v. MAV, Inc., 915 N.E.2d 1013, 1021 (Ind. Ct. App. 2009). We first determine whether any evidence or reasonable inferences support the trial court's findings of fact, and then we determine whether the findings support the judgment. Id. In doing so, we do not reweigh the evidence or assess the credibility of witnesses. Id. A finding of fact is clearly erroneous if the record contains no facts or reasonable inferences supporting it when the evidence is viewed in the light most favorable to the judgment. Id. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made or if the trial court applies the wrong legal standard to the properly found facts. Id.; L.H. Controls, Inc. v. Custom Conveyor, Inc., 974 N.E.2d 1031, 1041 (Ind. Ct. App. 2012).

## I. Mechanic's Liens

As noted above, KOC asks that we reverse the trial court's denial of its mechanic's liens on the basis that several of the trial court's findings were unsupported by the evidence. Regarding the boat, KOC contends that the trial court should have interpreted the statement that KOC would "take care of it" merely as an acknowledgment that they would do the mold remediation and summerization "because this is a business that they are engaged in," not as an agreement that they would perform the work for free. Appellant's Br. p. 8. Moreover, KOC states that "[i]t is unreasonable to infer that KOC

would remediate the mold and get the boat 'water ready' and not expect to be paid for their services." Id. And regarding the minibus, KOC argues that "[t]he record does not support a finding that KOC would retrieve a vehicle for NTA, store it for three months, and not receive any compensation." Id. at 7. Rather, KOC maintains that "the evidence presented at trial and the reasonable inferences drawn therefrom support a finding that KOC was authorized to perform work on the minibus and that they were appropriate in performing the work." Id. at 7-8.

Contrary to KOC's assertions, there was ample evidence in the record to support each of the trial court's findings of fact. Owen testified that when the mold in the boat was brought to his attention, his focus was on customer satisfaction. Tr. p. 169. He asked what KOC could do to remedy the situation, and when McLemore asked for his boat to be made water ready, Owen stated that KOC would "take care of it." Id. at 169, 194. McLemore's understanding of this conversation was that the services would be performed for free. Id. at 43-44. The trial court found that McLemore's interpretation was reasonable, and KOC's assertions otherwise are merely a request that we reweigh the evidence.

Similarly, we find no error with the trial court's determination that McLemore did not authorize any charges for services to the minibus other than for the lettering and decaling estimate, which KOC never provided. McLemore testified that Brown was going to transport the minibus for free because he was giving KOC the opportunity to receive the lettering and decaling business. Tr. p. 53-54. Invoices from the parties'

11

dealings showed that KOC never once charged for storage of a vehicle owned by NTA, and this evidence was further supported by McLemore's testimony regarding an agreement that storage fees would be charged for fleet vehicles but not for vehicles that NTA owned. Ex. 3; Tr. p. 49.

And although Barkowski and Brown testified that McLemore provided verbal authorization for KOC to perform the minibus door repair, and Brown testified that McLemore authorized the detailing of the minibus, McLemore testified that he never provided authorization for KOC to perform either service. Tr. p. 55, 147, 223-24. It is for the trial court to make credibility decisions in the face of conflicting testimony, and we will not second-guess those determinations.

## II. Damages

In arguing that the trial court erred by awarding damages in the amount of $5800 to NTA for lost profits on the minibus, KOC first argues that its possession of the minibus was not wrongful because it held a valid mechanic's lien. Having just determined that the trial court's conclusion otherwise was not erroneous, we need not further address this argument.

Next, KOC argues that the damage award was unsupported by the evidence because it was "based on the mere speculations of [McLemore]." Appellant's Br. p. 10. It is true that a lost profits award "cannot be based upon mere conjecture or speculation." L.H. Controls, Inc., 974 N.E.2d at 1043. However, "[l]ost profits need not be proved with mathematical certainty and are not impermissibly uncertain where there is testimony

that, while not sufficient to put the amount beyond doubt, is sufficient to enable a factfinder to make a fair and reasonable finding as to the proper damages." Id.

Here, McLemore testified without contradiction that he purchased the minibus at a price of $5175 solely for the purpose of selling it to Zion Lutheran High School at a price of $11,000, which would result in a profit of $5825. Tr. p. 53. And because KOC wrongfully detained the minibus, McLemore was unable to complete the sale. Id. Although no written purchase agreement was entered into evidence, we cannot say that McLemore's testimony alone was insufficient to support the trial court's award of lost profits.

Finally, KOC argues that the award constituted a windfall for NTA because it was permitted to keep both the minibus and receive an award for lost profits. KOC maintains that this placed NTA in a better position than it would have been if the sale to Zion Lutheran High School had been completed. In response, NTA points out that the damage award was based not on contract law, but on a provision in Indiana Code section 32-35-2-33 that allows for statutory damages for loss of use when a party successfully petitions for replevin of wrongfully detained property. And although "rental value is the normal method of measuring value of loss of use of property, lost profits may be used as a measure where such profits are ascertainable with a reasonable degree of certainty." Wolff v. Slusher, 161 Ind. App. 182, 189, 314 N.E.2d 758, 763 (1974) (internal citations omitted).

13

In the present case, the award of lost profits was adequately supported by the record to a reasonable degree of certainty. Tr. p. 53. In other words, the damage award fell within the scope of the evidence presented. See Indianapolis City Market Corp., 915 N.E.2d at 1024-25. And there is no windfall merely because NTA will be free to sell the minibus again, thus receiving the benefit of the original bargain and possibly the benefit of a second one. KOC failed to make this argument to the trial court, and indeed, failed to present any evidence at trial of the market value of the minibus. Without this evidence, it is impossible to know whether NTA will now be able to sell the minibus at a profit or whether he will have to sell it at a loss. In sum, there is simply no evidence from which we can conclude that the award of lost profits resulted in a windfall to NTA.

The judgment of the trial court is affirmed.

MAY, J., and MATHIAS, J., concur.