**FOR PUBLICATION**



ATTORNEYS FOR APPELLANT:

**JAMES P. FENTON**
**KATHRYN A. BROGAN**
Eilbacher Fletcher, LLP
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**NATHANIEL M. UHL**
Ice Miller, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| L.H. CONTROLS, INC., | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 16A05-1111-PL-606 |
| | ) | |
| CUSTOM CONVEYOR, INC., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE DECATUR SUPERIOR COURT
The Honorable Matthew D. Bailey, Judge
Cause No. 16D01-0902-PL-40

**September 19, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

L.H. Controls, Inc., ("LH") appeals the trial court's entry of judgment in favor of Custom Conveyor, Inc., ("CCI") in the amount of $1,467,587.61. We affirm in part, reverse in part, and remand.

**Issues**

The restated issues before this court are:

I. whether the trial court properly awarded CCI $1,149,470 in lost profit damages for LH's breaches of its contract with CCI;

II. whether the trial court properly concluded LH was contractually required to indemnify CCI for attorney fees and costs CCI incurred in this litigation; and

III. whether the trial court properly calculated the amount of contractual chargebacks to which CCI was entitled against LH and properly awarded CCI a money judgment for those chargebacks.

**Facts**

CCI is a company based in Greensburg that specializes in installing conveyor systems in factories around the world. When Honda announced that it was planning to construct a factory in Greensburg to build automobiles, CCI was eager to secure the contract to install the necessary conveyor systems in the factory.[1] On January 4, 2007, after negotiations between CCI and Honda, Honda contracted with CCI to install the conveyor systems and issued purchase orders to CCI totaling $9,172,595.00 for that

---

[1] The Greensburg factory is operated by Honda Manufacturing of Indiana, LLC, which we refer to as "Honda" throughout this opinion.

work. The purchase orders stated that the price was "firm," and "[n]o extras to this contract shall be considered without the prior approval of [Honda] purchasing." Ex. 141. Ordinarily, CCI strives to make a ten percent profit on its jobs. For the Honda project, however, the profit margin in CCI's bid was approximately five to six percent.

CCI subcontracted various aspects of the Honda project. One of its subcontractors was LH. LH was to provide computer programming and electrical control boxes for four conveyor lines: the in-panel, engine, rear suspension, and door assembly lines. CCI and LH agreed that LH would perform that work for $685,754.30, and CCI accordingly issued a purchase order to that effect on April 2, 2007. CCI subsequently agreed to two change orders requested by LH that raised the total contract amount to $788,582.30. One of the change orders, finalized in November 2007 for $77,929.50, was prompted by modifications in the conveyor system required by Schierholz, the system's German manufacturer. Along with this change order, LH created a schedule for its role in the Honda project. The other change order, completed in June 2008 for $19,325.00, was requested by LH after it performed electrical input/output testing at the Honda factory that was outside the scope of the original purchase order. CCI later claimed that LH overstated the number of hours its employees had spent on this issue.

The conveyor system portion of the Honda factory construction did not run precisely on schedule and without problems. One issue that arose in April 2008 was difficulties with an electrical subcontractor hired by CCI, Advanced Electrical Services ("AES"). Because of the poor quality of AES's work, CCI had to remove them from the

job in May 2008, hire different electrical subcontractors, and the conveyor project fell behind schedule. AES's mistakes caused CCI to incur approximately $196,000 more in expenses than it had planned to pay AES. Further complications in construction of the conveyor system arose from Honda's frequent modifications of various requirements.

Additionally, LH fell well behind schedule in its completion of programming for the conveyor system. LH did not comply with the schedule completed in the fall of 2007, and sometimes was misleading to CCI regarding the progress it was making. After December 2007, LH stopped providing semi-monthly written progress reports to CCI, as it was contractually required to do. One particular problem for CCI arose when LH failed to timely complete programming for the door assembly line. Because of this lack of programming, CCI had to manually install large, heavy containers onto the line at considerable expense because the containers could not be left on the factory floor without interfering with other construction work in the factory. Also with respect to the door line, CCI paid overtime to Robbins Electric to have the line ready for LH's onsite programming, but LH was not prepared to begin programming when it had said it would be. Furthermore, CCI paid for a German employee of Schierholz to remain in Greensburg for an extended period of time to assist LH employees with programming. CCI also incurred additional expense due to the following: LH's failure to print schematic drawings for CCI that it was contractually obligated to print; inaccuracies in some of the drawings; installing louvers on control boxes due to a design error by LH; installing lamacoids (plastic labels) on the boxes that LH failed to provide; and LH's

4

failure to reimburse CCI for worker's compensation coverage. Although CCI was unhappy with LH in several respects, CCI vice-president Tim Stapp said that it would have been a "catastrophe" to fire LH and attempt to hire a different controls company to complete the project. Tr. p. 422.

In June 2008, Honda began withholding progress payments to CCI because of delays in installing the conveyor lines. At one point, CCI informed LH that Honda was threatening to remove CCI from installing the conveyor systems if they were not completed by August 4, 2008. LH failed to meet this deadline; CCI was not in fact removed from the project at that time, and the conveyor lines were completed in mid-August. Honda accepted the lines as satisfactory. There is no evidence that Honda was unhappy with the quality of LH's final work on the project. Additionally, although it took three months longer to install the conveyor system than CCI originally anticipated, there is no evidence that such delay caused a delay in the ultimate opening of the Honda factory.

LH submitted its final, unpaid invoices to CCI on July 24, 2008—before it actually completed work on the project. Those invoices totaled $150,874.34. Meanwhile, in August 2008, after CCI's work on the project was complete, Honda officials expressed their gratitude to CCI for their work and opened discussions with CCI regarding payment for charges CCI incurred that exceeded the original contract price. As stated by Tim Stapp, CCI's vice-president, it "is not unheard of within some of the Japanese companies" to have meetings between companies after the completion of a large

5

construction project and to attempt to identify cost overruns and to negotiate a profit margin for the contractor, as opposed to having to file change orders during the course of the project. Id. at 451.

On October 17, 2008, CCI officials wrote a letter to Honda officials that stated in part:

> As we have discussed, a number of factors caused CCI to experience severe and crippling cost overruns. We have presented an itemized list of scope-of-project changes containing additional quantities, efficiencies and cost effects that adversely affected CCI during the course of this project. These items totaled $970,305.96 and represent only CCI's overruns of cost and overhead on the . . . project.
>
> CCI strives to generate a profit margin on all of its projects of ten percent (10%). In line with our discussions, and in an effort to continue our mutually rewarding partnership with Honda Manufacturing, we are prepared to close out this project on terms which would provide CCI a profit margin of just five percent (5%). This will require payment from Honda of $1,546,603.75, and allow both parties to resume what we expect to be a long-term relationship with Honda Manufacturing.

Ex. 119. Thus, in this letter CCI was seeking a profit payment from Honda of $576,297.79, or $1,546,603.75 minus cost overruns of $970,305.96. LH was not identified as a source of the cost overruns in this letter, or in internal CCI discussions regarding negotiations with Honda. Notes prepared by CCI staff during this time period state, "The two big items for the project to overrun the budget were the carriers. The other was the field inefficiencies." Ex. 193. LH was not mentioned as a cause of the

6

"field inefficiencies." This same document states, "Initial profit considered was 6.23% but fell to 3.44% . . . ." Id.

As of November 5, 2008, Honda had released the remaining retainage on the original CCI contract to CCI.[2] However, CCI had not paid any of LH's outstanding final invoices that LH had submitted in July.[3] On that date, LH filed a mechanic's lien against the factory, as well as a personal liability notice ("PLN") against Honda, based on CCI's non-payment of the invoices.[4] AES, likewise, had earlier filed a PLN against Honda for CCI's non-payment of its invoices. After LH filed the mechanic's lien, CCI founder Jim Stapp described the ongoing additional payment negotiations with Honda as going "extremely cold. Profit—basically discussions went away." Tr. p. 831. Also on November 5, 2008, CCI informed LH—for the first time—by email that it intended to withhold over $82,184.10 in chargebacks against LH when it made final payment to LH.

On November 14, 2008, Milt Paulins of Honda emailed Tim Stapp. The email listed five subcontractors whom CCI had not yet paid, including LH, AES, and Schierholz, and specifically noted LH's mechanic's lien and AES's PLN. The email stated:

---

[2] Pursuant to the Honda-CCI contract, Honda retained ten percent of the money otherwise owed to CCI when it made payments to CCI during the course of the construction, with that ten percent retainage to be paid after final completion of the project. The CCI-LH subcontract also provided for a ten percent retainage.

[3] CCI did apparently make a payment of $30,000 to LH in October 2008. There has never been any argument or evidence, however, that this payment went towards LH's final invoices of over $150,000.

[4] A PLN is an alternative to a mechanic's lien that gives notice to a property owner of a subcontractor's intent to seek payment for unpaid claims from the property owner. See Ind. Code § 32-28-3-9. It does not attach to the property.

7

> I was told [at an earlier face-to-face meeting] that CCI has sufficient funds to close these accounts and based on those assurances, the final retainer monies were released based on the sworn statements of that fact . . . . Obviously this is not the case in that a second lien notice (LH Controls) is now filed (AES being the first) and the list of known unresolved CCI subcontractor's accounts still unsettled [is] at least those listed above.

Ex. 194.

On November 17, 2008, CCI sent a check to LH for $68,691.24. Accompanying the check was a letter explaining that CCI was withholding $82,184.10 in chargebacks against LH's final invoices of $150,875.34. The chargebacks included deductions for CCI employees and independent tradesmen having to manually install the carriers on the door assembly line, for print inaccuracies, and for installing louvers and lamacoids on control boxes. The letter requested that LH "immediately execute and deliver to CCI a Lien Waiver Form 9704 to the extent of the enclosed payment." Ex. 102. The letter closed, "The filing of a Notice of Intention to Hold Mechanic's Lien by LH Controls is a breach of [LH's] contract obligation. CCI has no choice but to hold LH Controls responsible for all claims and damages arising from LH Control's breach in this regard." Id.

LH did not remove its mechanic's lien after receiving this payment, and negotiations between CCI and Honda continued. Jim Stapp emailed Paulins on November 18, 2008, and stated in part:

> CCI has moved quickly to have [LH's] lien removed from the Honda property. . . . We are attempting to bring the

8

remaining subcontractor's final payments to a speedy close with all staying on "fast track" until resolution is obtained on each.

It was further my understanding that the agreed to amounts from discussions held between CCI and Honda since August of this year on scope changes, quantity additions, and cost effect items like the Euro exchange rate were to gain approval whereby CCI would be afforded a chance to invoice for these amounts. Can you provide us with an update on the status of these efforts?

Lastly, Honda personnel's request that CCI to [sic] step away from the door line sub-assembly personnel slat conveyor so Honda could have someone else repair the line is the first time we have not had an opportunity to satisfactorily complete a project. We take this "failure" very seriously, and remain prepared to accept complete responsibility to get this piece of equipment running to the acceptance level of Honda.

Ex. 192. LH had no involvement with the conveyor line mentioned in the email.

Paulins responded via email on November 21, 2008. Therein, he assured Jim Stapp that Honda had not intended for CCI to "step-away" from the problematic conveyor line, and also made concessions to CCI regarding matters such as length of warranty CCI would owe to Honda. Ex. 179. Paulins also offered to make a final payment to CCI of $500,000.00.

On November 24, 2008,[5] Jim Stapp wrote a lengthy letter to Paulins, explaining that a payment of only $500,000.00 from Honda would jeopardize CCI's future survival. The letter stated, "We understand that we upset [Honda] personnel when we submitted our first letter of request to settle the monetary side of the project," referring to the

[5] The letter is dated October 24, 2008, but it clearly was actually sent on November 24, 2008, as clarified by Jim Stapp at trial.

October 17, 2008 letter wherein CCI requested payment of $1,546,603.75. Ex. 147. Among other options for settlement, including restating the $1,546,603.75 request, the letter stated that CCI had hired an independent accounting firm to review its books, and which firm had concluded CCI's actual expenses on the Honda project exceeded its budget by $970,000.00. The letter advised that payment of $970,000.00 by Honda would leave CCI with no profit on the project, but that "CCI should be able to survive but possibly under new ownership or management if [CCI's] lending institution is insecure about continuing a credit facility with an ownership/management team that worked for two years for free." Id.

On December 11, 2008, Paulins emailed Jim Stapp and informed him that "the president of [Honda] has authorized me to make you the offer of $975,000.00 as settlement of all issues relating to the [Honda] project as contracted by CCI." Ex. 149. CCI accepted this offer. CCI has continued to work on other projects for Honda. The ownership and management of CCI also has remained unchanged, i.e., Jim Stapp's fear that CCI's bank might force a reorganization of the company if he only accepted $970,000.00 from Honda was unfounded. Including the $975,000.00 extra received from Honda, CCI's finance manager calculated the total invoiced cost of the Honda project as $11,494,700.00 He also stated that "in our minds," CCI made no profit on the project. Tr. p. 720.

On February 9, 2009, LH filed suit against Honda and CCI. The complaint stated a breach of contract claim against CCI for failing to pay the remaining $82,184.10 on

10

LH's final invoices, i.e. the amount of chargebacks that CCI withheld. The complaint also sought to enforce the PLN against Honda and to foreclose the mechanic's lien, both to the extent of $82,184.10. On April 6, 2009, after the filing of a lien release bond by CCI, the trial court dismissed Honda as a defendant in this action, but not before Honda had incurred $928.86 in attorney fees, which Honda charged back to CCI against its $975,000.00 final payment.

On April 30, 2009, CCI filed its answer to LH's complaint and also stated counterclaims against LH for breach of contract, breach of warranty, and indemnification. On April 14, 2011, CCI amended its answer to allege for the first time that LH had failed to meet certain contractual conditions precedent to the receipt of final payment, by failing to provide drawings, by failing to return original drawings, plans, and specifications to CCI, and by failing to provide lien waivers to CCI.

On April 15, 2011, CCI moved for summary judgment against LH. Specifically, CCI sought outright judgment against LH on LH's PLN and mechanic's lien foreclosure claims.[6] CCI also sought a ruling that, as a matter of law, LH could recover no more than $5,259.38 on its breach of contract claim against CCI. CCI stated that the contractual "final payment" to which LH might be entitled was $76,924.72, which was the amount of ten percent retainage that existed on invoices LH had submitted to CCI for payment

---

[6] Although Honda had already been dismissed from the lawsuit, the mechanic's lien and PLN claims were not dismissed.

11

through March 25, 2008.[7]  However, CCI argued that LH could not recover this amount because of its failure to comply with the alleged conditions precedent to "final payment." Thus, subtracting $76,924.72 from LH's claimed breach of contract damages of $82,184.10 resulted in a "cap" on damages of $5,259.38.  On July 12, 2011, the trial court granted CCI's summary judgment motion, entering judgment against LH on its PLN and mechanic's lien foreclosure claims and limiting the amount of damages LH could possibly recover for breach of contract to $5,259.38.

The trial court held a bench trial on LH's breach of contract claim and CCI's counterclaims on July 25-28, 2011.  On October 18, 2011, the trial court entered judgment, accompanied by findings of fact and conclusions thereon per LH's request. The trial court found LH had breached its contract with CCI in twelve ways, that LH had a contractual obligation to indemnify CCI, and that LH had breached warranties owing to CCI.

The twelve breaches found by the trial court were as follows:

> 1.  LH Controls breached the Contract by failing to provide milestone schedules after December 2007.
>
> 2.  LH Controls breached the Contract by failing to provide progress reports after December 2007.
>
> 3.  LH Controls breached the Contract by failing to put dates drawn and revision dates on its drawings.

---

[7] Pursuant to the CCI-LH contract, on periodic invoices LH submitted prior to its final invoices, CCI paid ninety percent of the invoices and retained the other ten percent, with the cumulative amount of the retainage to be paid after completion of the project.

4. LH Controls breached the Contract when it threatened to stop work on the project.

5. LH Controls breached the Contract by failing to complete its programming work by the deadlines set forth in its October 5, 2007 schedule.

6. LH Controls breached the Contract by failing to order materials for the Door Line in October 2007 as set forth in its October 5, 2007 schedule.

7. LH Controls breached the Contract by failing to complete its work by the deadlines set forth in the February 28, 2008 Debug Schedule.

8. LH Controls breached the Contract by failing to provide properly qualified, fully experienced, and competent personnel.

9. LH Controls breached the Contract by failing to submit test reports and other data required by Honda.

10. LH Controls breached the Contract by recording a mechanic's lien on Honda's property.

11. LH Controls breached the Contract by failing to seek amicable resolution of its dispute with CCI.

12. LH Controls breached the Contract by failing to submit its dispute to mediation before filing this lawsuit.

App. pp. 32-33.

Largely adopting CCI's proposed findings, the trial court entered a total of $1,409,896.97 in damages against LH, broken down as follows:

17. LH Controls damaged CCI in the amount of $7,077.00 because CCI had to obtain a release of lien bond to remove LH Controls' mechanic's lien. CCI paid $7,077.00 in premiums for this release of lien bond.

13

18.     LH Controls damaged CCI in the amount of $928.86 because Honda deducted this amount from payments it owed CCI to indemnify Honda for its attorneys' fees incurred in this litigation.

19.     LH Controls damaged CCI in the amount of $5,787.00 because it overstated the June 13, 2008 Change Order by this amount.

20.     LH Controls damaged CCI in the amount of $82,184.10 due to the chargeback issues.  These issues are as follows:

       a.     CCI expended $68,241.52 moving carriers due to LH Controls' late delivery of the Door Line programs.

       b.     CCI expended $9,299.25 due to errors and inaccuracies in LH Controls' drawings.

       c.     CCI expended $2,194.13 printing electrical schematic drawings that LH Controls was obligated to print but did not.

       d.     CCI expended $1,297.20 installing louvers due to LH Controls' unauthorized installation of the wrong transformers.

       e.     CCI expended $544.50 creating lamacoids that LH Controls was obligated to provide and install but did not.

       f.     CCI expended $607.50 on OCIP [worker's compensation] premiums for LH Controls.  LH Controls was obligated to reimburse CCI for these premiums but did not.

21.     LH Controls damaged CCI in the amount of $39,375.00 because CCI had to extend Schierholz's advisory services due to delays caused by LH Controls.

22. LH Controls damaged CCI in the amount of $59,696.50 because CCI had Robbins Electric work overtime to complete the Door Line but LH Controls failed to have the programs ready when Robbins Electric completed its work. CCI expended $59,696.50 on this unnecessary overtime.

23. LH Controls damaged CCI in the amount of $75,637.79 because CCI incurred this amount of attorneys' fees and costs through July 14, 2011. These attorneys' fees and costs are reasonable.

24. LH Controls damaged CCI in the amount of $1,144,470.00 because Honda only paid CCI a profit of $5,000 on the job rather than the complete profit amount of $1,149,470.00,[8] and this lack of profit was directly caused by LH Controls.

25. LH Controls' unpaid contract balance is $5,259.38, and LH Controls should be given a credit for this unpaid contract balance. Taking into account this credit, CCI's damages caused by LH Controls total $1,409,896.87.

App. pp. 34-35. The trial court's order also directed that CCI submit evidence regarding attorney fees it incurred after July 14, 2011, with an opportunity for LH to respond. On the basis of this submission by CCI, on November 2, 2011, the trial court ordered LH to pay CCI an additional $57,690.74 in attorney fees and costs. This resulted in a total judgment against LH for $1,467,587.61. LH now appeals.

**Analysis**

Because the trial court entered special findings of fact and conclusions thereon at LH's request pursuant to Indiana Trial Rule 52, our standard of review is two-tiered. See

---

[8] This number is ten percent of the total invoiced value of CCI's participation in the Honda project, or $11,494,700, less $5,000.

15

Marion County Auditor v. Sawmill Creek, LLC, 964 N.E.2d 213, 216 (Ind. 2012). "We first determine whether the evidence supports the findings and then whether the findings support the judgment." Id. We "shall not set aside the findings or judgment unless clearly erroneous." Ind. Trial Rule 52(A). In determining whether a finding or judgment is clearly erroneous, we may neither reweigh the evidence nor reassess the credibility of the witnesses. Sawmill Creek, 964 N.E.2d at 216. "The evidence is viewed in the light most favorable to the judgment, and we will defer to the trial court's factual findings if they are supported by the evidence and any legitimate inferences therefrom." Id. at 216-17. A trial court's legal conclusions, however, are reviewed de novo. Id. A judgment also is clearly erroneous if the trial court has applied the wrong legal standard to properly found facts. Id.

We note the issues that LH is not raising in this appeal. It is not seeking reinstatement of its PLN or mechanic's lien foreclosure claims upon which the trial court granted summary judgment in favor of CCI. It is not challenging the following parts of the damages award: the $5,787.00 for LH's overstatement of the June 2008 change order, the $39,375.00 CCI paid Schierholz to have an employee on site to assist LH, and the $59,696.60 CCI paid Robbins Electric in overtime to complete work on the door assembly line. Finally, LH is not challenging the amount of the chargebacks CCI held against LH's final invoices, with the exception of the $68,241.52 figure CCI says it incurred in manually installing containers/carriers onto the door assembly line.

### I. Lost Profits

16

Before turning to the merits of LH's arguments regarding the award of over $1 million in lost profits damages to CCI, we must address CCI's contention that LH has waived those arguments by failing to present them to the trial court. "A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court." Dedelow v. Pucalik, 801 N.E.2d 178, 183 (Ind. Ct. App. 2003). LH's challenge to the award of lost profit damages is a claim of insufficient evidence to support that award. Traditionally, it has been held that "even in a civil case, a party may raise a sufficiency of the evidence claim for the first time in an appellant's brief." Jamrosz v. Resource Benefits, Inc., 839 N.E.2d 746, 757-58 (Ind. Ct. App. 2005), trans. denied.

Admittedly, our supreme court has modified that rule. Relying upon Indiana Trial Rules 50 and 59, it has held that "a claim of insufficient evidence must be preserved by proper presentation to the trial court," meaning such a challenge may not be initially raised on appeal in civil cases unless it was previously preserved by either a motion for judgment on the evidence filed before judgment or in a motion to correct error after judgment. Henri v. Curto, 908 N.E.2d 196, 208 (Ind. 2009). Henri concerned a jury trial, and Trial Rule 50(A) explicitly states that it applies to cases "tried before a jury or an advisory jury . . . ." Likewise, Trial Rule 59(A)(2) states that a motion to correct error is a prerequisite to appeal "when a party seeks to address . . . [a] claim that a jury verdict is excessive or inadequate." Henri concerned a jury trial. This case was tried to the bench, and so the dictates of Trial Rules 50 and 59, and likewise Henri's holding based on those

17

rules, do not apply here. As such, LH is permitted to challenge the sufficiency of the evidence supporting the lost profits judgment for the first time on appeal.

In any event, LH did state in opening argument before the trial court, "the actual facts are not going to support CCI's claim for the loss of profits." Tr. p. 70. Likewise, LH submitted proposed findings and conclusions stating in part, "In regard to the Defendant's claim of lost profits, the Court finds that the claim of lost profits is not compensable," and further explains why they were not compensable. App. p. 486. Clearly, the trial court was on notice that LH did not believe CCI was entitled to an award of damages for lost profits. LH does provide more expansive legal argument on appeal than it did to the trial court regarding why the lost profits award is inappropriate, but it has not waived those arguments. The appellate waiver rule for failing to make arguments to the trial court does not preclude a party from expanding upon arguments made to the trial court and presenting additional authorities to the appellate court, which is what LH has done here. See Dedelow, 801 N.E.2d at 183-84. We will address the merits of LH's arguments regarding lost profits.

It is axiomatic that a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered. Fowler v. Campbell, 612 N.E.2d 596, 603 (Ind. Ct. App. 1993). A party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred. Id. A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss

18

of profits, or direct inference from known circumstances. Id. The damages claimed also must be the natural, foreseeable, and proximate consequence of the breach. Id. The foreseeability of damages is based upon facts known at the time of entry into the contract, not facts existing or known at the time of the breach. Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc., 814 N.E.2d 649, 658-59 (Ind. Ct. App. 2004).

A party injured by a breach of contract may recover consequential damages from the breaching party. Rockford Mut. Ins. Co. v. Pirtle, 911 N.E.2d 60, 67 (Ind. Ct. App. 2009), trans. denied. "Such consequential damages may include lost profits, providing the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness." Clark's Pork Farms v. Sand Livestock Systems, Inc., 563 N.E.2d 1292, 1298 (Ind. Ct. App. 1990). Consequential damages may be awarded if the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made. Rockford, 911 N.E.2d at 67. The party seeking such damages bears the burden of proving by a preponderance of the evidence that the breach was the cause in fact of its loss. Id. "This generally limits consequential damages to reasonably foreseeable economic losses." Id.

If a party is seeking damages for lost profits, the award must be confined to lost net profits. Berkel, 814 N.E.2d at 658. An award of lost profit damages is proper if the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness. Id. Lost profits need not be proved with mathematical certainty and are not impermissibly uncertain where there is testimony that, while not

19

sufficient to put the amount beyond doubt, is sufficient to enable the factfinder to make a fair and reasonable finding as to the proper damages. Id. Any doubts and uncertainties as to proof of the exact measure of damages must be resolved against the defendant. Id. It is wholly improper, however, for a trier of fact to project past profits indefinitely into the future without evidence that the projection was at least reasonably certain. Belle City Amusements, Inc. v. Doorway Promotions, Inc., 936 N.E.2d 243, 250 (Ind. Ct. App. 2010). Also, an award of damages for lost profits cannot be based upon mere conjecture or speculation. T & W Bldg. Co. v. Merrillville Sport & Fitness, Inc., 529 N.E.2d 865, 868 (Ind. Ct. App. 1988), trans. denied.

After thoroughly reviewing the record, along with the trial court's findings and conclusions, we cannot discern any conceivable basis upon which to affirm the award of lost profit damages against LH in any amount. Assuming without deciding that LH did in fact breach its contract with CCI in all twelve ways identified by the trial court, including by filing a mechanic's lien, there simply is a complete absence of evidence that any single breach, or all twelve breaches in combination, caused compensable lost profit damages to CCI.[9] Any such award can only be based upon sheer speculation.

CCI has focused primarily upon LH's filing of the mechanic's lien while CCI was negotiating with Honda for an additional payment above the original CCI-Honda contract price as causing Honda to not agree to pay anything more than $5000 in profit to CCI.

---

[9] We thus find it unnecessary to address the parties' argument regarding whether the filing of the mechanic's lien was a breach of contract and/or whether it was statutorily authorized. Again, LH is not seeking reinstatement of its mechanic's lien foreclosure action.

20

The trial court's findings and conclusions did likewise. Tim and Jim Stapp testified as to those negotiations becoming more difficult after the lien was filed. There also was testimony that Japanese companies in particular are sometimes open to negotiating with contractors, after completion of a project, to make extra payment to the contractor based on cost overruns for which there had not been previous change orders. Finally, there was testimony that CCI generally aims to make a ten percent profit on projects that it completes, and had made closer to a sixteen percent profit on jobs other than the Honda project that it completed in roughly the same time period.[10]

This evidence and the findings related to it are not enough to support an award of lost profit damages. It is true that after the lien was filed, Honda expressed displeasure that CCI had not utilized the final retainage release under the original Honda-CCI contract to pay its subcontractors, including (but not limited to) LH. Most crucially, however, there is absolutely no evidence that Honda was considering, at any point in time, paying CCI a profit margin of $1,149,470.00 on this project. Indeed, CCI never asked Honda for such a profit margin. The most it ever asked in profit from Honda was $576,297.79. This is not to say that LH was required to pay this amount to CCI either. It

---

[10] CCI also directs us to testimony of Jim Stapp, where he said that after the offer of $975,000.00, "the position that Honda took was that we were done negotiating, and your profits went [indiscernible] your subcontractor." Tr. p. 841. CCI interprets the indiscernible portion of the transcript as "away due to." Regardless, the subcontractor is not identified, and does not indicate whether Honda believed that the cost overruns were caused by a subcontractor, or CCI's profits went to a subcontractor (as opposed to "away due to"), or whether Honda refused to pay any more to CCI because of problems caused by a subcontractor. This testimony is probative of nothing on the issue of lost profits.

simply demonstrates how lacking in any evidentiary foundation the award of $1,144,470.00 in lost profit damages is.

In any case, there is no evidence that Honda ever considered paying CCI even the lower-requested profit margin amount of $576,297.79 and only decided not to do so after LH filed its mechanic's lien. No one from Honda testified at trial. Jim Stapp's letter of November 24, 2008 to Honda states in part, "We understand that we upset [Honda] personnel when we submitted our first letter of request to settle the monetary side of the project," referring to the October 17, 2008 letter wherein CCI requested payment of $1,546,603.75. Ex. 147. This letter makes no mention of Honda having decided not to pay that amount because of the mechanic's lien; instead, it unmistakably implies that Honda was displeased with the original profit request at the time it was sent, i.e., before LH filed the mechanic's lien. Additionally, there is no evidence that Honda ever suggested, during these extra payment negotiations with CCI, that it was dissatisfied with the quality of LH's work; if anything, there was some possible unhappiness with a conveyor line with which LH had no involvement.

Nor is it in any way sufficient that CCI generally wishes to make a ten percent profit on its projects or had made sixteen percent profit on other recent jobs. Although CCI apparently has had dealings with other Japanese companies, it had no dealings with Honda before this project; thus, there was no basis upon which CCI could reasonably expect that Honda might make an after-the-fact profit margin payment of ten percent to CCI. There likewise is no evidence of Honda making such payments to contractors

22

generally. Also, CCI's built-in profit margin in its original bid to Honda was approximately five to six percent, not ten percent. Honda was under absolutely no contractual obligation to make an additional payment at the completion of the project to compensate CCI for its cost overruns and to make an additional profit margin payment to CCI.

We also note there is a lack of any findings or evidence that LH, when it entered into the contract with CCI, had any reason to believe it might be held accountable, if it breached the contract, for any amount of lost profit to which CCI unilaterally believed it could, in theory, have extracted from Honda in post-construction negotiations. CCI also sought the post-construction payment from Honda to compensate it for cost overruns that are completely unrelated to LH's performance on the job. CCI admits in its brief that the cost overruns came about because of "numerous changes" ordered by Honda that "increased the scope and complexity of CCI's work and, as a result, increased the cost of CCI's work to $11,494,700." Appellee's Br. p. 19. To the extent LH caused additional expense to CCI because of its breaches, those expenses are accounted for in the chargebacks CCI withheld from its final payment to LH, along with the non-lost profit damages awarded by the trial court that LH is not challenging on appeal. Even if we were to assume that cost overruns on the Honda project both evaporated the five to six percent profit margin in CCI's original bid and caused cost overruns over the original bid, those overruns were not LH's fault, aside from the matters we noted.

23

This case bears a resemblance to Eden United, Inc. v. Short, 653 N.E.2d 126 (Ind. Ct. App. 1995), trans. denied. Eden concerned a complicated real estate transaction gone bad, a claim of tortious interference with contractual relations, and resulting lost profit damages. Specifically, a land developer, Short, claimed that Eden's tortious interference had caused Short's sale of property to a third party, Schuman, not to be consummated. The property was divided into two halves. There was a definitive agreement regarding Short's sale of the first half of the property to Schuman reflecting that Short would have received a profit of $1,285,022.51 after the sale to Schuman. However, Short and Schuman never reached a definitive agreement regarding terms for the sale of the second half of the property. Regardless, the trial court effectively concluded that Short would have received the same profit on the second land sale that he was to have received on the first sale. It thus doubled the expected profit margin on the first sale and awarded lost profit damages against for tortious interference in the amount of $2,570,000.00.

This court reversed, to the extent of holding that Short only was entitled to lost profit damages with respect to the first half of the property, or $1,285,000.00. Eden, 653 N.E.2d at 132-33. We held with respect to the second half of the property, "one finding of fact necessary to support such hypothetical calculation of the award is fatally absent: that there was an agreement for a second sale sufficient to award lost profit thereon." Id. at 132. In reviewing the record, we noted that Short and Schuman never reached agreement regarding terms or price for the second half of the property. Id. We also noted that, despite evidence of previous successful real estate transactions between Short

24

and Schuman, this particular sale was different and "was contingent upon the parties' expectation, hope, or conjecture" that the property would appreciate in value. Id. at 133.

Although Eden concerned tortious interference with contractual relations, its holding regarding lost profit damages is instructive. If anything, there was a much more concrete basis in that case for an award of lost profits with respect to the second half of the property. At least in that case there was a similar agreed-to transaction with which to compare the potential second transaction. Here, there is nothing to compare. There had never been a similar after-the-fact profit payment agreement between CCI and Honda. There simply was an "expectation, hope, or conjecture" by CCI that Honda might be willing to make a substantial profit margin payment to CCI at the completion of the project, with nothing in the record upon which to base such an expectation.

It certainly is true, as CCI argues in its brief, that it is entitled to seek to make a profit on projects it completes. However, there is nothing in the trial court's findings or the record that would support shifting that profit expectation onto the back of LH. Such a shifting would be a windfall to CCI, not a proper measure of damages. This is not a reweighing of the evidence because there is nothing to weigh. Instead, there is a complete absence of evidence necessary to support a lost profits damages award and the trial court's judgment entering such an award is clearly erroneous. We reverse the trial court's award of lost profit damages in the amount of $1,144,470.00.

## II. Indemnification

25

Next, we address whether LH was required to indemnify CCI in the form of paying all of the attorney fees that CCI has incurred in this litigation since its inception, as well as costs CCI incurred in connection with the filing of the mechanic's lien. Regarding attorney fees generally, Indiana adheres to the rule that each party to litigation must pay its own attorney fees. Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers Mut. Ins. Co., 837 N.E.2d 1032, 1037 (Ind. Ct. App. 2005). Attorney fees are not recoverable as damages in a breach of contract action in the absence of a statute, rule, or contractual agreement to the contrary. Id. at 1037-38. This court also has held that if a defendant's breach of contract causes a plaintiff to engage in litigation with a third party and such action would not have been necessary but for the breach, attorney fees and litigation expenses associated with the third party litigation may be awarded as breach of contract damages. Id. at 1039. This exception is inapplicable here because of a lack of third-party litigation.

The sole basis that CCI cites as support for the award of its attorney fees, as well as the costs associated with the mechanic's lien, is section 10.1.1 of the standard Honda Master Construction Agreement ("MCA"). The MCA not only controlled the relationship between Honda and CCI, but also was incorporated into and made part of the contract between CCI and LH. LH does not dispute that the MCA applied to its relations with CCI, and that under the MCA as incorporated it occupied the position of "Contractor" and CCI occupied the position of "Owner." This contractual provision reads:

26

> Obligation to Idemnify. Except as other prohibited by applicable Laws, Contractor [LH] shall indemnify and hold harmless Owner [CCI] and its parent, and all of their subsidiaries, affiliates, members, partners, shareholders, officers, directors, managers, agents and employees, from and against all claims, actions, causes of action, suits, damages, losses, and expenses of any nature, including but not limited to attorneys' fees (collectively "Costs"), arising out of, or claimed to have arisen out of, resulting from or otherwise relating to the performance of the Contract, or the failure to perform, in accordance with the Contract Documents, by the Contractor or any Subcontractor or Supplier or anyone directly or indirectly employed or engaged by any of them, or any breach by Contractor, or any way related to the Work, Materials or Services provided hereunder, including but not limited to, any and all Costs arising out of or claimed to have arisen out of or resulting from injuries or damage to property, loss of use of property, or the injuries or death to persons.

App. p. 225.

Our supreme court has held that "indemnification clauses are strictly construed and the intent to indemnify must be stated in clear and unequivocal terms." Fresh Cut, Inc. v. Fazli, 650 N.E.2d 1126, 1132 (Ind. 1995). Indemnity agreements are subject to the standard rules and principles of contract construction. Henthorne v. Legacy Healthcare, Inc., 764 N.E.2d 751, 756 (Ind. Ct. App. 2002). Clear and unambiguous language in indemnity agreement must given its plain and ordinary meaning and will be construed to cover all losses and damages to which it reasonably appears the parties intended it to apply. Id. An ambiguous indemnity provision will be construed against the drafter of the instrument. Fresh Cut, 650 N.E.2d at 1132. Interpretation of a written contract, including indemnity provisions, is a question of law. Mead Johnson & Co., Inc.

27

v. Kenco Group, Inc., 899 N.E.2d 1, 2 (Ind. Ct. App. 2009). Thus, we review de novo the trial court's conclusion that LH was required to indemnify CCI. See Sawmill Creek, 964 N.E.2d at 217.

LH argues that the "Obligation to Indemnify" provision does not operate to require it to indemnify CCI for first-party claims, or in other words claims between LH and CCI. Instead, it asserts that this provision applies only to claims between CCI and a third party. CCI counters that the provision clearly requires LH to indemnify it with respect to both first- and third-party claims.

We conclude that the indemnity provision of the MCA is ambiguous on the question of whether it covers first-party claims. The general legal understanding of indemnity clauses is that they cover "'the risk of harm sustained by third persons that might be caused by either the indemnitor or the indemnitee. It shifts the financial burden for the ultimate payment of damages from the indemnitee to the indemnitor.'" Indianapolis City Market Corp. v. MAV, Inc., 915 N.E.2d 1013, 1023 (Ind. Ct. App. 2009) (quoting Morris v. McDonald's Corp., 650 N.E.2d 1219, 1222 (Ind. Ct. App. 1995) (emphasis added by Indianapolis City Market). See also Am.Jur.2d 415, Indemnity § 1 (2005) ("In general, indemnity is a form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party"); C.J.S. 94, Indemnity § 1 (2007) ("In a contract of indemnity, the indemnitor, for a consideration, promises to indemnify and save harmless indemnitee against liability of indemnitee to a third person or against loss resulting from such liability").

This is not to say that there is an absolute prohibition against one party agreeing to indemnify the other party for claims arising between those parties, or first-party claims. "[T]he term 'indemnity' encompasses any duty to pay for another's loss or damage and is not limited to reimbursement of a third-party claim." Am.Jur.2d 415, Indemnity § 1. This court held in Sequa Coatings Corp. v. Northern Indiana Commuter Transp. Dist., 796 N.E.2d 1216, 1229 (Ind. Ct. App. 2003), aff'd on r'hg, trans. denied, that the "plain language" of an indemnity provision was such that it required first-party indemnification. The particular language of the indemnity provision in Sequa, however, expressly stated that it applied to, among other things, "any and all Causes of Action, as defined above, asserted by any parties and non-parties to this Agreement . . . ." Id. (emphasis added). There is no such "plain language" here in the MCA's indemnity provision, clearly and unambiguously stating that LH would be required to indemnify CCI for all costs associated with any cause of action asserted even by parties to the agreement in a breach of contract action between the parties.

We also find no support for CCI's position in a case it cites, Fackler v. Powell, 891 N.E.2d 1091 (Ind. Ct. App. 2008), trans. denied. Fackler held that a husband was required to pay his ex-wife's attorney fees after his breach of a dissolution property settlement agreement, and which agreement stated that each party agreed "to indemnify and save and hold the other harmless from all . . . expenses (including attorney's fees) . . . incurred by reason of the indemnitor's violation or breach of any of the terms and conditions hereof." Fackler, 891 N.E.2d at 1098. It is clear that a divorce decree

29

indemnity provision such as the one in <u>Fackler</u> would cover a first-party indemnity claim, i.e. where one party successfully sues the other for breach of contract and requests attorney fees.[11]  Here, by contrast, the MCA does not mention first-party claims.

Having concluded that the MCA's indemnity provision is ambiguous, we believe it is appropriate to construe it against CCI.[12]  Although CCI did not technically draft the MCA—Honda did—it was CCI who informed LH that the MCA would be part of the LH-CCI contract documents, and CCI who occupies Honda's position of "Owner" and indemnitee under the MCA.  We further conclude that because the indemnity provision does not clearly and unambiguously state that it applies to first-party claims, such as the LH-CCI dispute, it is appropriate to hold that the provision applies only to third-party claims, in accordance with the traditional legal understanding of indemnity provisions. We also note that the MCA could have contained a clear fee-shifting provision in the event of a contract dispute between the parties to the contract, but there is no such provision.  LH was not required to indemnify CCI for its attorney fees incurred in the litigation between LH and CCI.  We reverse the entirety of the attorney fees award in favor of CCI, or $133,328.53; again, CCI cites no alternative basis for that award.

---

[11] There was no argument by the parties in <u>Fackler</u> that the indemnity provision governed only third-party claims.  The same is true of <u>Kolbet v. Kolbet</u>, 760 N.E.2d 1146 (Ind. Ct. App. 2002), another divorce-indemnity clause case that CCI cites.  We question the propriety of relying upon indemnity clauses in divorce cases in a case involving a complex, multi-million dollar construction project.

[12] We find it unnecessary to address LH's argument that CCI, in negotiations with Honda, managed to secure a modification from Honda of section 10.1.1 of the MCA.  Regardless, that modification was not reflected in the copy of the MCA attached to and incorporated into the CCI-LH contract, and LH never negotiated a similar change directly with CCI.

LH also challenges the trial court's award of the following: (1) $928.86 in attorney fees that Honda incurred in response to LH's filing of the mechanic's lien and which amount Honda charged back to CCI; and (2) the $7,077.00 CCI paid in premiums for a bond to have the lien released from Honda's factory and, consequently, to have Honda dismissed from this lawsuit. Contrary to the first-party award of attorney fees to CCI, we conclude that these amounts properly fall within the third-party purview of the MCA's indemnity provision. That is, CCI incurred these costs not in direct litigation with LH, but as an indirect consequence of LH's litigation with Honda. Those costs also clearly arose out of or were related to LH's performance of the contract, and LH therefore is required to indemnify CCI for those costs. We, therefore, affirm the trial court's award of those costs as part of CCI's damages.

### III. Chargebacks

Finally, we address LH's arguments related to the chargebacks CCI withheld from the final payment to LH. We briefly reiterate the facts related to this issue. LH submitted its final invoices to CCI in July 2008, for $150,874.34. This amount included $76,924.72 that had previously been retained by CCI on LH's prior invoices. In November 2008, CCI made its final payment to LH in the amount of $68,691.24, after deducting $82,184.10 in chargebacks for various expenses CCI claimed it incurred related to LH's failure to perform various contractual obligations. On CCI's motion for summary judgment, the trial court ruled that the most LH could recover on its breach of contract claim against CCI was $5,259,38. After trial, the trial court ultimately awarded

31

damages to CCI on the chargebacks issue totaling $76,924.72, or $82,184.10 less $5,259.38.

### *A. Conditions Precedent for Final Payment*

The first sub-issue we address on this point is whether the trial court properly held on CCI's summary judgment motion that LH had failed to meet contractually-required conditions precedent to the receipt of final payment. This ruling also established that the most that LH could recover on its $82,184.10 breach of contract claim against CCI was $5,289.38—or $82,184.10 less the ten percent retainage of $76,924.72. In other words, even if at trial LH had proven that all of the chargebacks had been erroneous, LH still only could have recovered $5,289.38.

Conversely, CCI contends that because of this summary judgment ruling, the total price of the CCI-LH subcontract was reduced by $76,924.72, the amount CCI characterizes as the contractual "final payment" to which LH was entitled if LH had satisfied the conditions precedent.[13] And, CCI argues it would not constitute a double recovery for CCI both to receive a money judgment for $76,924.72 (or $82,184.10 less a $5,289.38 set-off to LH) and to have withheld $82,184.10 from LH's final invoices of $150,874.34, because the $76,924.72 exceeded the true price of the CCI-LH subcontract.

Our review of this sub-issue is under the standard for granting summary judgment: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Kroger Co. v. Plonski, 930 N.E.2d 1, 4-5 (Ind. 2010).

---

[13] CCI is referring to "final payment" here as a term of art, not the actual final payment to LH of $68,692.24.

Summary judgment should be granted only if the designated evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. at 5. "All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party." Id. On appeal, this court may reverse a grant of summary judgment in favor of one party and direct that summary judgment should have been entered in favor of the other party, if the undisputed evidence supports it, even if the opposing party did not file a cross-motion for summary judgment. See Lakes v. Grange Mut. Cas. Co., 964 N.E.2d 796, 805 (Ind. 2012); see also Ind. Trial Rule 56(B).

CCI successfully argued to the trial court that LH failed to meet three conditions precedent to its receipt of final payment. The contract between CCI and LH stated in part:

> A final payment, consisting of the unpaid balance of the Subcontract Price shall be made within thirty (30) days after the last of the following to occur: (a) full completion of the Work by Subcontractor [LH], (b) final acceptance of the Work by Owner [Honda] and Architect, (c) the furnishing of satisfactory evidence by Subcontractor that Subcontractor has paid in full all persons furnishing labor, material or services in connection with the Work and that Subcontractor neither has filed, nor has the right to maintain, a lien against the Owner, the Contractor [CCI], Contractor's surety, if any, or the Project, (d) the return of all drawings, plans and specifications to the Contractor, (e) delivery of all guarantees, warranties, bonds, instruction manuals, as built drawings and similar items required by the Agreement between Owner and Contractor and/or this Subcontract and (f) release of retention and payment by the Owner in respect of Subcontractor's Work.

33

App. p. 179. CCI argues that LH was not entitled to final payment of $76,924.72 under this provision because it failed to provide drawings, failed to return original drawings, plans, and specifications to CCI, and failed to provide lien waivers to CCI.

Assuming without deciding that the above-quoted contract language constituted conditions precedent to final payment, we agree with LH that CCI waived reliance upon any such purported conditions precedent.[14] A contractual condition precedent is a condition that must be performed before the agreement of the parties becomes a binding contract or that must be fulfilled before the duty to perform a specific obligation arises. McGraw v. Marchioli, 812 N.E.2d 1154, 1157 (Ind. Ct. App. 2004). Indiana recognizes the general rule that an express condition precedent must be fulfilled or no liability can arise on the promise that the condition qualifies. Id.

One party's compliance with a condition precedent, however, may be excused by the other party's waiver. Id. Waiver of a contractual provision is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intent to relinquish it. Westfield Nat. Ins. Co. v. Nakoa, 963 N.E.2d 1126, 1132 (Ind. Ct. App. 2012), trans. denied. "Waiver may be implied from the acts, omissions, or conduct of one of the parties to the contract." Id. We also note that the

---

[14] CCI argues that LH waived some of its arguments regarding waiver of the conditions precedent. However, much as with the lost profits argument, LH on appeal has at most merely expanded upon arguments it made to the trial court. It has not made entirely new arguments, and they are not waived on appeal. See Dedelow v. Pucalik, 801 N.E.2d 178, 183-84 (Ind. Ct. App. 2003).

waiver of a condition occurring after the time for performance of the condition is referred to as an election. McGraw, 812 N.E.2d at 1158.

> "The word election signifies a choice, one that is often binding on the party that makes it . . . . Courts often hold that a party that chooses to disregard the nonoccurrence of a condition is bound by an election to treat the duty as unconditional; that party cannot reinstate the condition even if the other party has not relied on this choice."

Id. (quoting II E. Allen Farnsworth, Farnsworth on Contracts § 8.5 (3d ed. 2004)).

Here, on November 5, 2008, Jeff Jones, CCI's finance manager, informed Ralph Keefer of LH via email, "CCI is prepared to make final payment to LH Controls for the Honda project." Ex. 17 (emphasis added). The email explained that CCI would be withholding chargebacks of $82,184.10 from LH's final invoice balance of $150,875.34. On November 17, 2008, Jones mailed a check to LH for $68,691.24, again explaining that chargebacks of $82,184.10 were being withheld from payment to LH and stating, "This amount covers the open invoices from LH Controls . . . ." Ex. 102. There was no mention in the email or letter that LH allegedly had failed to comply with any contractual conditions precedent to the receipt of final payment. In fact, the first time in the record that CCI ever alleged that LH failed to comply with any conditions precedent to "final payment" was on April 14, 2011, when CCI amended its answer, nearly two years after the initial filing of its answer to LH's complaint, to include that allegation.

We conclude that the November 5, 2008 email, November 17, 2008 letter, and November 17, 2008 check establish as a matter of law that CCI waived its ability to insist

that LH comply with the alleged conditions precedent before LH was entitled to final payment. Clearly and unequivocally, CCI indicated to LH that the $68,691.24 check was, in fact, final payment. The only reason given for a deduction from the total outstanding invoiced amount was chargebacks—not a failure to comply with conditions precedent. As LH points out, if the failure to comply with conditions precedent was the true reason CCI was withholding the bulk of the $82,184.10, CCI could have informed LH of that fact, thus giving LH a timely opportunity to fulfill those conditions. Although there may have been no set date for LH's performance of the conditions precedent, we believe CCI's conduct in this case is in the form of an election not to insist on such performance. In other words, by representing to LH that it was in fact making final payment to LH, CCI elected to treat the alleged conditions precedent as unconditional. It cannot now renege on that representation. See McGraw, 812 N.E.2d at 1158.[15]

CCI also argues that certain non-waiver/non-modification provisions in the contract between CCI and LH made it impossible for CCI to have waived insistence on LH's compliance with the conditions precedent. First, the non-waiver provision, found in the Honda MCA incorporated into the CCI-LH contractual relationship, states:

> The failure of either party at any time to enforce any right or remedy available to it under the Contract with respect to any breach or failure shall not be construed to be a waiver of such right or remedy with respect to any other breach or failure by the other party.

---

[15] Waiver is measured by the conduct of a party holding the right, without reference to the acts of the other party. Coghill v. Badger, 418 N.E.2d 1201, 1209 (Ind. Ct. App. 1981). Thus, CCI's arguments about LH's conduct with respect to "final payment" are irrelevant.

36

App. p. 237. This provision does not apply under these circumstances. It states that a party's failure to insist on compliance with the contract at one time will not be a waiver to insist on compliance "with respect to any <u>other</u> breach or failure . . . ." <u>Id.</u> (emphasis added). CCI alleges that LH failed to comply with the conditions precedent for final payment, but it waived its right to insist after-the-fact on such performance by LH. Under this provision, if LH later breached the contract or failed to perform an obligation under it, CCI could insist on such performance, regardless of CCI's <u>previous</u> waiver. We do not read this provision as making it impossible for CCI to ever waive insistence on complying with a contractual provision. It only applies prospectively—a choice to ignore a breach or failure to perform on one occasion will not constitute waiver on the occasion of a future breach or failure to perform.

CCI also directs us to the following language in the purchase order it issued to LH: "Any purchase order changes, deviations or substitutions must be directed only to our Project Manager in writing and copied to this buyer. Any changes will only be acknowledged by a purchase order change order—NO EXCEPTIONS." <u>Id.</u> at 174. This language clearly contemplates that any changes in the work would have to be submitted in writing. It addresses the issue of contract modification. There was no alleged modification of the contract here; there only was CCI's waiver of its right to insistence on LH's performance of the alleged conditions precedent to final payment. This provision does not apply.

37

In sum, we conclude the trial court erred in entering summary judgment in CCI's favor on this issue. The undisputed evidence establishes that CCI waived reliance on the alleged conditions precedent to final payment. In other words, (1) the total price of the CCI-LH subcontract was not reduced by $76,924.72 and (2) LH was entitled to pursue at trial its claim that it was entitled to $82,184.10 for the erroneous chargebacks.

Having reached this conclusion, it is evident that the trial court erred in including the $82,184.10 in chargebacks as part of the judgment entered against LH. CCI had already withheld $82,184.10 from money it owed LH. This entire litigation arose out of LH's seeking to recover that $82,184.10 as money to which it claimed it was contractually entitled. In other words, CCI received $82,184.10 in goods and/or services from LH that it did not pay for, and CCI received a judgment against LH in that amount (less $5,259.38). This should not have been an element of damages awarded against LH. LH is correct in asserting that both allowing these chargebacks to reduce the amount that CCI contractually owed and in awarding a money judgment in the same amount equals an impermissible double recovery for CCI. It also would improperly allow CCI to be placed in a better position than they would have enjoyed if LH had not breached the contract. See INS Investigations Bureau, Inc. v. Lee, 784 N.E.2d 566, 576 (Ind. Ct. App. 2003) (stating "[t]he law disfavors a windfall or a double recovery" and that a party may not obtain a double recovery for a single wrong), trans. denied. Our holding on this point also negates the $5,259.38 set-off in favor of LH that the trial court made against the $82,184.10 in chargeback damages.

38

### B.  Calculation of Chargebacks

Finally, we address LH's argument that the trial court partially erred in its post-trial findings of the chargebacks CCI was entitled to take.  Although we have held CCI was not entitled to a judgment for this amount, resolution of this issue is relevant to LH's own claim for breach of contract and whether it is entitled to any recovery on that claim. LH contends that CCI overstated the proper amount of the chargebacks by $43,096.46, thus making the amount of chargebacks $39,087.64 (or $82,184.10 - $43,096.46).  LH essentially is seeking a set-off of $43,096.46 against the amount of damages awarded to CCI that LH is not contesting on appeal.

We reiterate the general standard of review regarding damages in breach of contract cases.  A party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered.  Fowler, 612 N.E.2d at 603.  A party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred.  Id.  A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances.  Id.  The damages claimed also must be the natural, foreseeable, and proximate consequence of the breach.  Id.  We also reiterate that in our review, we cannot reweigh the evidence or judge witness credibility.  Sawmill Creek, 964 N.E.2d at 216.

LH contends that the chargebacks were overstated with respect to CCI having to manually install large, heavy containers onto the door assembly line at considerable

39

expense because the containers could not be left off the conveyor without interfering with other construction work in the factory. CCI had to incur this expense because LH failed to timely complete programming for that line. CCI asserted that it incurred expenses totaling $68,241.52 on this issue, while LH asserts that CCI actually only incurred direct labor expenses of $25,145.06, for a difference of $43,096.46.

Unlike the issue of lost profits, reversal on this issue would require us to reweigh the evidence, which we cannot do. At trial, Tim Stapp testified as to why there was a difference between direct labor costs of $25,145.06 and the actual chargeback amount of $68,241.52. Specifically, he explained that the difference accounted for things such as tool rental, the use of expendable materials, and overhead costs. LH asserts that CCI should not be able to recover costs such as those in a breach of contract action. However, on this matter, it was not clearly erroneous for the trial court to find and determine, based on Tim Stapp's testimony, that CCI was justified in charging the entirety of the $68,241.52 back to LH. We affirm the trial court's finding that CCI properly charged back $82,184.10 to LH against its request for final payment, which means that LH recovers nothing on its breach of contract claim against CCI.

## Conclusion

We reverse the trial court's award of lost profit damages to CCI in the amount of $1,144,470.00. We also reverse the award of $133,328.53 in attorney fees to CCI and the award of damages of $82,184.10 for CCI's chargebacks, as well as the $5,259.38 set-off for LH the trial court had allowed against the $82,184.10. We affirm the award of

40

$7,077.00 and $928.86 in costs related to CCI's removal of the mechanic's lien against Honda's property. Together with the damages LH does not challenge on appeal ($59,696.60, $39,375.00, and $5,787.00), this will result in a total award to CCI of $112,864.46. We remand for the trial court to make the necessary corrections to its judgment.

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER, J., and MAY, J., concur.