## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 02 2018, 5:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Fred L. Cline
Oliver & Cline, LLP
Danville, Indiana

ATTORNEYS FOR APPELLEE

Nathaniel Lee
Robert E. Feagley, II
Lee Cossell Crowley, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Hometown Station, Inc., *et al.,*

*Appellants-Plaintiffs,*

v.

Jimmy Jessey,

*Appellee-Defendant.*

February 2, 2018

Court of Appeals Case No.
32A01-1707-PL-1548

Appeal from the Hendricks Circuit Court

The Honorable Daniel F. Zielinski, Judge

Trial Court Cause No.
32C01-1605-PL-61

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Plaintiffs, Hometown Station, Inc. and CE Hughes Enterprises, LLC (collectively, the Business), appeal the trial court's judgment in favor of Appellee-Defendant, Jimmy Jessey (Jessey), on a breach of contract claim.

We affirm.

# ISSUE

The Business raises two issues on appeal, one of which we find dispositive and restate as: Whether the trial court erroneously concluded that Jessey did not breach his obligations under a contract entered into with the Business.

# FACTS AND PROCEDURAL HISTORY

In 2015, Christopher Edward Hughes was the owner of both Hometown Station, Inc. and CE Hughes Enterprises, LLC, which together comprised the Business. The Business owned and operated a gas station/convenience store located at 5871 Liberty Parkway in Clayton, Hendricks County, Indiana. On August 18, 2015, the Business and Jessey entered into an Asset Purchase Agreement (APA), pursuant to which Jessey agreed to purchase substantially all of the assets of the Business (*i.e.*, the gas station, real estate, contracts, intellectual property, etc.) for a price of $1,600,000.

The terms of the APA specified that Jessey,

> [w]ithin fifteen (15) days of this [APA], . . . shall obtain a
> Commitment for Title Insurance . . . and legible instruments

affecting the Real Estate and recited as exceptions in the Commitment. If [Jessey] has an objection to items disclosed in such Commitment or the survey provided herein, [Jessey] shall make written objections to [the Business] within fifteen (15) days after the delivery of the Commitment. [The Business] shall have fifteen (15) days from the date such objections are disclosed to cure the same. If the objections are not satisfied within such time period, [Jessey] may in [his] sole discretion (a) terminate this [APA] and Escrow Agent shall return the Earnest Money to [Jessey], (b) grant [the Business] an extension of time to cure the objection, or (c) waive the unsatisfied objections and close the transaction.

(Appellant's App. Vol. II, p. 17). Furthermore, the consummation of the transaction was subject to Jessey

securing a general financing commitment from a financial institution or any other party, upon commercially reasonable terms, within one hundred twenty (120) days of the execution of this [APA]. [Jessey] shall exert due diligence in pursuing, applying for and obtaining such a commitment. In the event that [Jessey] does not obtain a financing commitment within one hundred twenty (120) days of the execution of this [APA], [Jessey] may receive an extension of sixty (60) days upon payment to [the Business] of an additional non-refundable payment of Ten Thousand Dollars ($10,000.00), which payment shall be applied to the Purchase Price at Closing.

(Appellant's App. Vol. II, p. 22). Thus, Jessey had until approximately December 16, 2015, to obtain commercially reasonable financing, and the APA specified that the deal would close five days thereafter.

[6]     In accordance with the APA, Jessey applied for a Commitment for Title Insurance from Fidelity National Title Insurance Company. The title search revealed that in May of 2015, the Business's lender had commenced foreclosure proceedings against the gas station and property. The Business had entered into a forbearance arrangement with its lender and was anticipating that the proceeds of the sale would cover its debt and cancel out the foreclosure action. Nevertheless, the Business did not disclose the pending foreclosure to Jessey during negotiations.

[7]     Jessey forwarded a copy of the APA and the title survey to a financial broker, Raj Tulshan (Tulshan) of Hudson and Capital in New York, with whom he had worked on numerous occasions in the past to finance his various business developments. However, due to the pending foreclosure, Jessey's request for financing "was shot down at the beginning." (Tr. Vol. II, p. 65). Although Jessey never submitted any written objections to the Business, he subsequently informed the Business in person that he would be unable to complete the purchase due to the pending foreclosure. Yet, the Business and Jessey discussed the possibility of refinancing in order "to get rid of this problem," so negotiations remained ongoing. (Tr. Vol. II, p. 75). Although the Business did refinance its loans in January of 2016, as a result of which the foreclosure action was dismissed, the APA was never revived. In April of 2016, the Business agreed to sell its business to another buyer for the price of $1,300,000, which was finalized on May 10, 2016.

On May 26, 2016, the Business filed a Complaint, alleging that Jessey had breached the APA by failing to exert due diligence in pursuing, applying for, and obtaining a financing commitment. The Business sought at least $300,000 in damages, along with prejudgment interest, court costs, attorney fees, and all other appropriate relief. On April 25, 2017, the trial court conducted a bench trial. On June 9, 2017, the trial court issued Findings of Fact and Conclusions of Law and entered judgment in favor of Jessey. Specifically, the trial court determined that "Jessey was unable to purchase [the Business's assets] due to his inability to secure financing, and that he was unable to obtain financing due to the undisclosed mortgage foreclosures, which hampers commercial real estate transaction." (Appellant's App. Vol. II, p. 9).

The Business now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Pursuant to the Business's request, the trial court entered specific findings of fact and conclusions thereon, thus triggering a review under Indiana Trial Rule 52(A): our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In applying this two-tiered standard of review, we consider "whether the evidence supports the findings and then whether the findings support the judgment." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1041 (Ind. Ct. App. 2012). In determining whether a finding or judgment is clearly erroneous, we neither reweigh

evidence nor reassess the credibility of witnesses. *Id.* Instead, we view the evidence in a light most favorable to the judgment and "defer to the trial court's factual findings if they are supported by the evidence and any legitimate inferences therefrom." *Id.* However, we review a trial court's legal conclusions *de novo. Id.* In addition, a judgment will be found to be clearly erroneous "if the trial court has applied the wrong legal standard to properly found facts." *Id.* at 1042.

## II. *Breach of the APA*

The Business claims that Jessey breached the APA because he did not exercise due diligence in obtaining financing. "The elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff." *WESCO Distribution, Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 695 (Ind. Ct. App. 2014), *trans. dismissed*. "The construction of a contract and an action for its breach are matters of judicial determination." *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind. Ct. App. 2009). Thus, in general, construction of a written contract is a matter of law and is reviewed *de novo. Id.* When construing a contract, "unambiguous contractual language is conclusive upon the parties and the courts." *Id.* However, where a contract is ambiguous, "its meaning is determined by extrinsic evidence and its construction is a matter for the fact-finder." *Id.* A court "should attempt to determine the parties' intent at the time the contract was made" by reading the contract as a whole and relying on "the language used to express their rights and duties." *Id.* "The court will make every attempt to construe the contractual

language such that no words, phrases, or terms are rendered ineffective or meaningless." *Id.* at 216. Rather, a contract should be interpreted such that the provisions harmonize rather than conflict. *Id.*

[12] In this case, the closing of the sale of the Business's assets was contingent upon Jessey "[s]ecuring a general financing commitment . . . upon commercially reasonable terms[] within one hundred twenty (120) days" of executing the APA. (Appellant's App. Vol. II, p. 22). Jessey was contractually obligated to "exert due diligence in pursuing, applying for and obtaining such a [financing] commitment." (Appellant's App. Vol. II, p. 22). Relying on dictionary definitions for "due diligence," the Business now asserts that Jessey "exerted no 'continual effort' to gain financing," but instead "only spoke to one financing broker who had his information on file, and there was no evidence that that broker ever contacted even a single lender. And Jessey never received any written denial for financing." (Appellant's Br. p. 9). Furthermore, the Business insists that the evidence does not support a finding that the pending foreclosure impeded Jessey's ability to obtain financing.

[13] On the other hand, Jessey points out that the APA, "written by [the Business's] attorney[,] is silent with regard to the definition of the due diligence required by [Jessey]." (Appellee's Br. p. 10). Jessey also argues that the Business's argument that he "was required to make a 'continual effort' to obtain financing . . . fails to address at what point [Jessey] would be excused from further attempts to obtain financing." (Appellee's Br. p. 10). Notwithstanding the fact "that [the Business] did not have clear title to transfer the asset due to the

pending foreclosure," Jessey argues that the evidence established that he engaged in the due diligence reasonably expected by the parties at the time of contracting. (Appellee's Br. p. 10).

[14] Where terms are not defined in the contract at issue, our courts have previously "turn[ed] to sources that reflect the ordinary meaning of the term at the time the contract was executed." *Reuille v. E.E. Brandenberger Const., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). In this case, at the time of execution, Black's Law Dictionary defined the term "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." BLACK'S LAW DICTIONARY 553 (10th ed. 2014). "Diligence" is more specifically defined as "[c]onstant application to one's business or duty; persevering effort to accomplish something undertaken. . . . The attention and care required from a person in a given situation; care; heedfulness." BLACK'S LAW DICTIONARY 552-53 (10th ed. 2014).

[15] The trial court concluded that "Jessey exercised due diligence in [the pursuit of] obtaining a financial commitment." (Appellant's App. Vol. II, p. 9). We agree. As the trial court found, Jessey contacted Tulshan, a financial broker whom Jessey had utilized since 2011, and "forwarded to [Tulshan] the [APA] and title commitment in an attempt to obtain financing for the property." (Appellant's App. Vol. II, p. 9). During the bench trial, Jessey testified that Tulshan maintains a file with all of Jessey's updated financial information and that Tulshan applied for financing on Jessey's behalf with "about nine different

banks." (Tr. Vol. II, p. 66). Jessey stated that financing was denied because of the pending foreclosure. Furthermore, the trial court accorded special credit to Jessey's testimony based on Jessey's substantial experience in buying and selling convenience stores. Specifically, Jessey

> has owned and operated numerous convenience stores, gas stations, and commercial businesses since the late 1980's and was familiar with the loan process of banks and/or financial institutions denying financing if the business had a foreclosure filed against it, since the business was deemed a high risk, and therefore, banks and financing companies would deny the application due to foreclosure.

(Appellant's App. Vol. II, p. 9).

[16] The evidence clearly establishes that Jessey was not going to be able to obtain typical, "commercially reasonable" financing while a foreclosure was pending against the assets subject to the sale. (Appellant's App. Vol. II, p. 22). By the time the Business refinanced and the foreclosure case was dismissed, the timeframe for closing the deal had expired. While Jessey acknowledged that special financing conditions may have been available under certain criteria for purchasing "a failing business," the fact remains that the Business did not disclose the pending foreclosure to Jessey, and no provision for obtaining special financing in the event of such an occurrence was included in the APA. (Tr. Vol. II, p. 75). Jessey pursued financing in the same manner that he did for his prior successful transactions: he contacted a financial broker who contacted lenders on his behalf. We therefore agree with the trial court that Jessey

exercised the required care under the situation for seeking financing and did not breach the APA.[1]

# CONCLUSION

Based on the foregoing, we conclude that the trial court correctly found that Jessey did not breach the APA because he exercised due diligence in pursuing financing to purchase the Business's assets.

Affirmed.

Baker, J. and Brown, J. concur

---

[1] Based on our determination that Jessey did not breach the APA due to a lack of diligence, we need not consider the Business's additional argument that the trial court erroneously concluded that, even in the event of a breach, the Business failed to mitigate its damages. Nor do we address Jessey's assertions that any breach on his part would be excused by a breach of the Business's duty of good faith and fair dealing and constructive fraud.